Justice KENNEDYdelivered the opinion of the Court.
In 1970, Congress created the National Railroad Passenger Corporation, most often known as Amtrak. Later, Congress granted Amtrak and the Federal Railroad Administration (FRA) joint authority to issue "metrics and standards" that address the performance and scheduling of passenger railroad services. Alleging that the metrics and standards have substantial and adverse effects upon its members' freight services, respondent-the Association of American Railroads-filed this suit to challenge their validity. The defendants below, petitioners here, are the Department of Transportation, the FRA, and two individuals sued in their official capacity.
Respondent alleges the metrics and standards must be invalidated on the ground that Amtrak is a private entity and it was therefore unconstitutional for Congress to allow and direct it to exercise joint authority in their issuance. This argument rests on the Fifth Amendment Due Process Clause and the constitutional provisions regarding separation of powers. The District Court rejected both of respondent's claims. The Court of Appeals for the District of Columbia Circuit reversed, finding that, for purposes of this dispute, Amtrak is a private entity and that Congress violated nondelegation principles in its grant of joint authority to Amtrak and the FRA. On that premise the Court of Appeals invalidated the metrics and standards.
Having granted the petition for writ of certiorari, 573 U.S. ----, 134 S.Ct. 2865, 189 L.Ed.2d 805 (2014), this Court now holds that, for purposes of determining the validity of the metrics and standards, Amtrak is a governmental entity. Although Amtrak's actions here were governmental, substantial questions respecting the lawfulness of the metrics and standards-including questions implicating the Constitution's structural separation of powers and the Appointments Clause, U.S. Const., Art. II, § 2, cl. 2-may still remain in the case. As those matters have not yet been passed upon by the Court of Appeals, this case is remanded.
I
A
Amtrak is a corporation established and authorized by a detailed federal statute enacted by Congress for no less a purpose than to preserve passenger services and routes on our Nation's railroads. See Lebron v. National Railroad Passenger Corporation,513 U.S. 374, 383-384, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995); National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co.,470 U.S. 451, 453-457, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985);
*1229 see also Rail Passenger Service Act of 1970, 84 Stat. 1328. Congress recognized that Amtrak, of necessity, must rely for most of its operations on track systems owned by the freight railroads. So, as a condition of relief from their common-carrier duties, Congress required freight railroads to allow Amtrak to use their tracks and facilities at rates agreed to by the parties-or in the event of disagreement to be set by the Interstate Commerce Commission (ICC). See 45 U.S.C. §§ 561, 562 (1970 ed.). The Surface Transportation Board (STB) now occupies the dispute-resolution role originally assigned to the ICC. See 49 U.S.C. § 24308(a) (2012 ed.). Since 1973, Amtrak has received a statutory preference over freight transportation in using rail lines, junctions, and crossings. See § 24308(c).
The metrics and standards at issue here are the result of a further and more recent enactment. Concerned by poor service, unreliability, and delays resulting from freight traffic congestion, Congress passed the Passenger Rail Investment and Improvement Act (PRIIA) in 2008. See 122 Stat. 4907. Section 207(a) of the PRIIA provides for the creation of the metrics and standards:
"Within 180 days after the date of enactment of this Act, the Federal Railroad Administration and Amtrak shall jointly, in consultation with the Surface Transportation Board, rail carriers over whose rail lines Amtrak trains operate, States, Amtrak employees, nonprofit employee organizations representing Amtrak employees, and groups representing Amtrak passengers, as appropriate, develop new or improve existing metrics and minimum standards for measuring the performance and service quality of intercity passenger train operations, including cost recovery, on-time performance and minutes of delay, ridership, on-board services, stations, facilities, equipment, and other services." Id.,at 4916.
Section 207(d) of the PRIIA further provides:
"If the development of the metrics and standards is not completed within the 180-day period required by subsection (a), any party involved in the development of those standards may petition the Surface Transportation Board to appoint an arbitrator to assist the parties in resolving their disputes through binding arbitration." Id.,at 4917.
The PRIIA specifies that the metrics and standards created under § 207(a) are to be used for a variety of purposes. Section 207(b) requires the FRA to "publish a quarterly report on the performance and service quality of intercity passenger train operations" addressing the specific elements to be measured by the metrics and standards. Id.,at 4916-4917. Section 207(c) provides that, "[t]o the extent practicable, Amtrak and its host rail carriers shall incorporate the metrics and standards developed under subsection (a) into their access and service agreements." Id.,at 4917. And § 222(a) obliges Amtrak, within one year after the metrics and standards are established, to "develop and implement a plan to improve on-board service pursuant to the metrics and standards for such service developed under [§ 207(a) ]." Id.,at 4932.
Under § 213(a) of the PRIIA, the metrics and standards also may play a role in prompting investigations by the STB and in subsequent enforcement actions. For instance, "[i]f the on-time performance of any intercity passenger train averages less than 80 percent for any 2 consecutive calendar quarters," the STB may initiate an investigation "to determine whether and to what extent delays ... are due to causes that could reasonably be addressed ... by *1230 Amtrak or other intercity passenger rail operators." Id.,at 4925-4926. While conducting an investigation under § 213(a), the STB "has authority to review the accuracy of the train performance data and the extent to which scheduling and congestion contribute to delays" and shall "obtain information from all parties involved and identify reasonable measures and make recommendations to improve the service, quality, and on-time performance of the train." Id.,at 4926. Following an investigation, the STB may award damages if it "determines that delays or failures to achieve minimum standards ... are attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation." Ibid.The STB is further empowered to "order the host rail carrier to remit" damages "to Amtrak or to an entity for which Amtrak operates intercity passenger rail service." Ibid.
B
In March 2009, Amtrak and the FRA published a notice in the Federal Register inviting comments on a draft version of the metrics and standards. App. 75-76. The final version of the metrics and standards was issued jointly by Amtrak and the FRA in May 2010. Id.,at 129-144. The metrics and standards address, among other matters, Amtrak's financial performance, its scores on consumer satisfaction surveys, and the percentage of passenger-trips to and from underserved communities.
Of most importance for this case, the metrics and standards also address Amtrak's on-time performance and train delays caused by host railroads. The standards associated with the on-time performance metrics require on-time performance by Amtrak trains at least 80% to 95% of the time for each route, depending on the route and year. Id.,at 133-135. With respect to "host-responsible delays"-that is to say, delays attributed to the railroads along which Amtrak trains travel-the metrics and standards provide that "[d]elays must not be more than 900 minutes per 10,000 Train-Miles." Id.,at 138. Amtrak conductors determine responsibility for particular delays. Ibid.,n. 23.
In the District Court for the District of Columbia, respondent alleged injury to its members from being required to modify their rail operations, which mostly involve freight traffic, to satisfy the metrics and standards. Respondent claimed that § 207 "violates the nondelegation doctrine and the separation of powers principle by placing legislative and rulemaking authority in the hands of a private entity [Amtrak] that participates in the very industry it is supposed to regulate."Id.,at 176-177, Complaint ¶ 51. Respondent also asserted that § 207 violates the Fifth Amendment Due Process Clause by "[v]esting the coercive power of the government" in Amtrak, an "interested private part[y]." Id.,at 177, ¶¶ 53-54. In its prayer for relief respondent sought, among other remedies, a declaration of § 207's unconstitutionality and invalidation of the metrics and standards. Id.,at 177.
The District Court granted summary judgment to petitioners on both claims. See 865 F.Supp.2d 22 (D.C.2012). Without deciding whether Amtrak must be deemed private or governmental, it rejected respondent's nondelegation argument on the ground that the FRA, the STB, and the political branches exercised sufficient control over promulgation and enforcement of the metrics and standards so that § 207 is constitutional. See id.,at 35.
The Court of Appeals for the District of Columbia Circuit reversed the judgment of the District Court as to the nondelegation and separation of powers claim, reasoning *1231 in central part that because "Amtrak is a private corporation with respect to Congress's power to delegate ... authority," it cannot constitutionally be granted the "regulatory power prescribed in § 207." 721 F.3d 666, 677 (2013). The Court of Appeals did not reach respondent's due process claim. See ibid.
II
In holding that Congress may not delegate to Amtrak the joint authority to issue the metrics and standards-authority it described as "regulatory power," ibid.-the Court of Appeals concluded Amtrak is a private entity for purposes of determining its status when considering the constitutionality of its actions in the instant dispute. That court's analysis treated as controlling Congress' statutory command that Amtrak " 'is not a department, agency, or instrumentality of the United States Government.' " Id.,at 675(quoting 49 U.S.C. § 24301(a)(3)). The Court of Appeals also relied on Congress' pronouncement that Amtrak " 'shall be operated and managed as a for-profit corporation.' " 721 F.3d, at 675(quoting § 24301(a)(2)); see also id.,at 677("Though the federal government's involvement in Amtrak is considerable, Congress has both designated it a private corporation and instructed that it be managed so as to maximize profit. In deciding Amtrak's status for purposes of congressional delegations, these declarations are dispositive"). Proceeding from this premise, the Court of Appeals concluded it was impermissible for Congress to "delegate regulatory authority to a private entity." Id.,at 670; see also ibid.(holding Carter v. Carter Coal Co.,298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), prohibits any such delegation of authority).
That premise, however, was erroneous. Congressional pronouncements, though instructive as to matters within Congress' authority to address, see, e.g., United States ex rel. Totten v. Bombardier Corp.,380 F.3d 488, 491-492 (C.A.D.C.2004)(Roberts, J.), are not dispositive of Amtrak's status as a governmental entity for purposes of separation of powers analysis under the Constitution. And an independent inquiry into Amtrak's status under the Constitution reveals the Court of Appeals' premise was flawed.
It is appropriate to begin the analysis with Amtrak's ownership and corporate structure. The Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock. Amtrak's Board of Directors is composed of nine members, one of whom is the Secretary of Transportation. Seven other Board members are appointed by the President and confirmed by the Senate.49 U.S.C. § 24302(a)(1). These eight Board members, in turn, select Amtrak's president. § 24302(a)(1)(B); § 24303(a). Amtrak's Board members are subject to salary limits set by Congress, § 24303(b); and the Executive Branch has concluded that all appointed Board members are removable by the President without cause, see 27 Op. Atty. Gen. 163 (2003).
Under further statutory provisions, Amtrak's Board members must possess certain qualifications. Congress has directed that the President make appointments based on an individual's prior experience in the transportation industry, § 24302(a)(1)(C), and has provided that not more than five of the seven appointed Board members be from the same political party, § 24302(a)(3). In selecting Amtrak's Board members, moreover, the President must consult with leaders of both parties in both Houses of Congress in order to "provide adequate and balanced representation of the major geographic regions *1232 of the United States served by Amtrak." § 24302(a)(2).
In addition to controlling Amtrak's stock and Board of Directors the political branches exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations. Amtrak must submit numerous annual reports to Congress and the President, detailing such information as route-specific ridership and on-time performance. § 24315. The Freedom of Information Act applies to Amtrak in any year in which it receives a federal subsidy, 5 U.S.C. § 552, which thus far has been every year of its existence. Pursuant to its status under the Inspector General Act of 1978 as a " 'designated Federal entity,' " 5 U.S.C.App. § 8G(a)(2), p. 521, Amtrak must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission. Furthermore, Congress conducts frequent oversight hearings into Amtrak's budget, routes, and prices. See, e.g., Hearing on Reviewing Alternatives to Amtrak's Annual Losses in Food and Beverage Service before the Subcommittee on Government Operations of the House Committee on Oversight and Government Reform, 113th Cong., 1st Sess., 5 (2013) (statement of Thomas J. Hall, chief of customer service, Amtrak); Hearing on Amtrak's Fiscal Year 2014 Budget: The Starting Point for Reauthorization before the Subcommittee on Railroads, Pipelines, and Hazardous Materials of the House Committee on Transportation and Infrastructure, 113th Cong., 1st Sess., p. 6 (2013) (statement of Joseph H. Boardman, president and chief executive officer, Amtrak).
It is significant that, rather than advancing its own private economic interests, Amtrak is required to pursue numerous, additional goals defined by statute. To take a few examples: Amtrak must "provide efficient and effective intercity passenger rail mobility," 49 U.S.C. § 24101(b); "minimize Government subsidies," § 24101(d); provide reduced fares to the disabled and elderly, § 24307(a); and ensure mobility in times of national disaster, § 24101(c)(9).
In addition to directing Amtrak to serve these broad public objectives, Congress has mandated certain aspects of Amtrak's day-to-day operations. Amtrak must maintain a route between Louisiana and Florida. § 24101(c)(6). When making improvements to the Northeast corridor, Amtrak must apply seven considerations in a specified order of priority. § 24902(b). And when Amtrak purchases materials worth more than $1 million, these materials must be mined or produced in the United States, or manufactured substantially from components that are mined, produced, or manufactured in the United States, unless the Secretary of Transportation grants an exemption. § 24305(f).
Finally, Amtrak is also dependent on federal financial support. In its first 43 years of operation, Amtrak has received more than $41 billion in federal subsidies. In recent years these subsidies have exceeded $1 billion annually. See Brief for Petitioners 5, and n. 2, 46.
Given the combination of these unique features and its significant ties to the Government, Amtrak is not an autonomous private enterprise. Among other important considerations, its priorities, operations, and decisions are extensively supervised and substantially funded by the political branches. A majority of its Board is appointed by the President and confirmed by the Senate and is understood by the Executive to be removable by the President at will. Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit. Thus, in its joint *1233 issuance of the metrics and standards with the FRA, Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions. And that exercise of governmental power must be consistent with the design and requirements of the Constitution, including those provisions relating to the separation of powers.
Respondent urges that Amtrak cannot be deemed a governmental entity in this respect. Like the Court of Appeals, it relies principally on the statutory directives that Amtrak "shall be operated and managed as a for profit corporation" and "is not a department, agency, or instrumentality of the United States Government." §§ 24301(a)(2)-(3). In light of that statutory language, respondent asserts, Amtrak cannot exercise the joint authority entrusted to it and the FRA by § 207(a).
On that point this Court's decision in Lebron v. National Railroad Passenger Corp.,513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), provides necessary instruction. In Lebron,Amtrak prohibited an artist from installing a politically controversial display in New York City's Penn Station. The artist sued Amtrak, alleging a violation of his First Amendment rights. In response Amtrak asserted that it was not a governmental entity, explaining that "its charter's disclaimer of agency status prevent[ed] it from being considered a Government entity." Id.,at 392, 115 S.Ct. 961. The Court rejected this contention, holding "it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." Ibid.To hold otherwise would allow the Government "to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." Id.,at 397, 115 S.Ct. 961. Noting that Amtrak "is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees," id.,at 398, 115 S.Ct. 961, and that the Government exerts its control over Amtrak "not as a creditor but as a policymaker," the Court held Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution." Id.,at 394, 399, 115 S.Ct. 961.
Lebronteaches that, for purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status. Lebroninvolved a First Amendment question, while in this case the challenge is to Amtrak's joint authority to issue the metrics and standards. But "[t]he structural principles secured by the separation of powers protect the individual as well." Bond v. United States,564 U.S. ----, ----, 131 S.Ct. 2355, 2365, 180 L.Ed.2d 269 (2011). Treating Amtrak as governmental for these purposes, moreover, is not an unbridled grant of authority to an unaccountable actor. The political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget. Accordingly, the Court holds that Amtrak is a governmental entity, not a private one, for purposes of determining the constitutional issues presented in this case.
III
Because the Court of Appeals' decision was based on the flawed premise that Amtrak should be treated as a private *1234 entity, that opinion is now vacated. On remand, the Court of Appeals, after identifying the issues that are properly preserved and before it, will then have the instruction of the analysis set forth here. Respondent argues that the selection of Amtrak's president, who is appointed "not by the President ... but by the other eight Board Members," "call[s] into question Amtrak's structure under the Appointments Clause," Brief for Respondent 42; that § 207(d)'s arbitrator provision "is a plain violation of the nondelegation principle" and the Appointments Clause requiring invalidation of § 207(a), id.,at 26; and that Congress violated the Due Process Clause by "giv[ing] a federally chartered, nominally private, for-profit corporation regulatory authority over its own industry," id.,at 43. Petitioners, in turn, contend that "the metrics and standards do not reflect the exercise of 'rulemaking' authority or permit Amtrak to 'regulate other private entities,' " and thus do not raise nondelegation concerns. Reply Brief 5 (internal citation omitted). Because "[o]urs is a court of final review and not first view," Zivotofsky v. Clinton,566 U.S. ----, ----, 132 S.Ct. 1421, 1430, 182 L.Ed.2d 423 (2012)(internal quotation marks omitted), those issues-to the extent they are properly before the Court of Appeals-should be addressed in the first instance on remand.
The judgment of the Court of Appeals for the District of Columbia Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.