Justice KAVANAUGH, concurring.
I join the Court's opinion in full. I write separately to emphasize three points.
First, the Court's interpretation of the Clean Water Act regarding pollution "from" point sources adheres to the interpretation set forth in Justice Scalia's plurality opinion in Rapanos v. United States, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006). The Clean Water Act requires a permit for "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A) ; see §§ 1311(a), 1342(a). The key word is "from." The question in this case is whether the County of Maui needs a permit for its Lahaina Wastewater Reclamation Facility. No one disputes that pollutants originated at Maui's wastewater facility (a point source), and no one disputes that the pollutants ended up in the Pacific Ocean (a navigable water). Maui contends, however, that it does not need a permit. Maui says that the pollutants did not come "from" the Lahaina facility because the pollutants traveled through groundwater before reaching the ocean.
Justice Scalia's plurality opinion in Rapanos explained why Maui's interpretation of the Clean Water Act is incorrect. In that case, Justice Scalia stated that polluters could not "evade the permitting requirement of § 1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters." 547 U.S. at 742-743, 126 S.Ct. 2208. Justice Scalia reasoned that the Clean Water Act does not merely "forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the 'addition of any pollutant to navigable waters.' Thus, from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit 'directly into' covered waters, but pass 'through conveyances' in between." Id. , at 743, 126 S.Ct. 2208 (citations omitted).
In other words, under Justice Scalia's interpretation in Rapanos, the fact that the pollutants from Maui's wastewater facility reach the ocean via an indirect route does not itself exempt Maui's facility from the Clean Water Act's permitting requirement for point sources. The Court today adheres to Justice Scalia's analysis in Rapanos on that issue.
Second, as Justice Scalia's opinion in Rapanos pointed out and as the Court's opinion today explains, the statute does not establish a bright-line test regarding when a pollutant may be considered to have come "from" a point source. The source of the vagueness is Congress' statutory text, not the Court's opinion. The Court's opinion seeks to translate the vague statutory text into more concrete guidance.
Third, JUSTICE THOMAS' dissent states that "the Court does not commit" to "which factors are the most important" in determining whether pollutants that enter navigable waters come "from" a point source. Post, at 1481 - 1482. That critique is not accurate, as I read the Court's opinion. The Court identifies relevant factors to consider and emphasizes that "[t]ime and distance are obviously important." Ante, at 1476. And the Court expressly adds that "[t]ime and distance will be the most important factors in most cases, but *1479 not necessarily every case." Ante, at 1477. Although the statutory text does not supply a bright-line test, the Court's emphasis on time and distance will help guide application of the statutory standard going forward.
With those additional comments, I join the Court's opinion in full.
Justice THOMAS, with whom Justice GORSUCH joins, dissenting.
The Clean Water Act (CWA) requires a federal permit for "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a) ; see § 1342. The CWA defines a "discharge" as "any addition of any pollutant to navigable waters from any point source." § 1362(12).[1] Based on the statutory text and structure, I would hold that a permit is required only when a point source discharges pollutants directly into navigable waters. The Court adopts this interpretation in part, concluding that a permit is required for "a direct discharge." Ante , at 1475 - 1476. But the Court then departs from the statutory text by requiring a permit for "the functional equivalent of a direct discharge ," ibid. , which it defines through an open-ended inquiry into congressional intent and practical considerations. Because I would adhere to the text, I respectfully dissent.
I
A
In interpreting the statutory definition of "discharge," the Court focuses on the word "from," but the most helpful word is "addition." That word, together with "to" and "from," limits the meaning of "discharge" to the augmentation of navigable waters.
Dictionary definitions of "addition" denote an augmentation or increase. Webster's Third New International Dictionary defines "addition" as "the act or process of adding: the joining or uniting of one thing to another." Webster's Third New International Dictionary 24 (1961); see also ibid. (listing "increase" and "augmentation" as synonyms for "addition"). Other dictionary definitions from around the time of the statute's enactment are in accord. See, e.g., American Heritage Dictionary 14, 15 (1981) (defining "addition" as "[t]he act or process of adding" and defining "add" as "[t]o join or unite so as to increase in size, quantity, or scope"); see also Webster's New International Dictionary 29, 30 (2d ed. 1957) (defining "addition" as the "[a]ct, process, or instance of adding," and defining "add" as to "join or unite, as one thing to another, or as several particulars, so as to increase the number, augment the quantity, enlarge the magnitude, or so as to form into one aggregate").
The inclusion of the term "addition" in the CWA indicates that the statute excludes anything other than a direct discharge. When a point source releases pollutants to groundwater, one would naturally say that the groundwater has been augmented with pollutants from the point source. If the pollutants eventually reach navigable waters, one would not naturally say that the navigable waters have been augmented with pollutants from the point *1480 source. The augmentation instead occurs with pollutants from the groundwater.
The prepositions "from" and "to" reinforce this reading. When pollutants are released from a point source to another point source or groundwater, they are added to the second from the first. If the pollutants are later released to navigable waters, they are added to the navigable waters from the second point source or the groundwater. One would not naturally say that the pollutants are added to the navigable waters from the original point source.
Interpreting "discharge" to mean a direct discharge makes sense of other parts of the definition as well. It respects the statutory definition of a point source as a "conveyance," see § 1362(14), because a point source that releases pollutants directly into navigable waters is a means of conveyance. And it makes sense of the word "any" before "point source," because that term clarifies that any kind of point source may require a permit.
The structure of the CWA confirms this interpretation. It authorizes the Environmental Protection Agency (EPA) to regulate discharges from point sources, including through the permitting process, but it reserves to the States the primary responsibility for regulating other sources of pollution, including groundwater. With respect to these sources, the EPA merely collects information, coordinates with the States, and provides funding. See 33 U.S.C. §§ 1252(a), 1254(a)(5), 1282(b)(2), 1288, 1314(a), 1329 ; ante , at 1470 - 1472. In the CWA, Congress expressly stated its "policy ... to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." § 1251(b). Thus, construing the EPA's power to regulate point sources to allow the agency to regulate nonpoint sources and groundwater is in serious tension with Congress' design.
My reading is also consistent with our decision in South Fla. Water Management Dist. v. Miccosukee Tribe , 541 U.S. 95, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004). The petitioner in that case argued that no permit was required when a point source was not the original source of the pollutant but instead conveyed the pollutant from further up a chain of sources. Id. , at 104, 124 S.Ct. 1537. We rejected that argument because "a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.' " Id. , at 105, 124 S.Ct. 1537. Although that case did not involve the exact question presented here, the direct-discharge interpretation comports well with that previous decision.
B
The Court's main textual argument reads the word "from" in isolation. But as the Court recognizes, "the word 'from' necessarily draws its meaning from context." Ante , at 1473. The Court's example using "arrive" instead of "addition" is thus unpersuasive, ante, at 1474 - 1475, because "from" takes different meanings with different verbs. The Court's culinary example also misses the mark, ante , at 1475, because if the drippings from the meat collect in the pan before the chef adds them to the gravy, the drippings are added to the gravy from the pan, not from the meat. This point becomes clear if we reorder the majority's recipe to match the statute; the chef has not added the drippings to the gravy from the meat. The Court's bathwater example, ante, at 1475, suffers from the same problem; if the well water is put in a bucket before it is put in the bathtub, it is added to the bathtub from the bucket. Only by reading the phrase in its entirety can we interpret the definition of "discharge."
*1481 See Deal v. United States , 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).
The Court also asserts that a narrower reading than the one it adopts would create a "massive loophole" in the statute. Ante , at 1476. Far from creating a loophole, my reading is the most logical because it is consonant with the scope of Congress' power. The CWA presumably was passed as an exercise of Congress' authority "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. My interpretation ties the statute more closely to navigable waters, on the theory that they are at least a channel of these kinds of commerce.
Further, the Court's interpretation creates practical problems of its own. As the Court acknowledges, its opinion gives almost no guidance, save for a list of seven factors. But the Court does not commit to whether those factors are the only relevant ones, whether those factors are always relevant, or which factors are the most important. See ante , at 1475 - 1477. It ultimately does little to explain how functionally equivalent an indirect discharge must be to require a permit.[2]
The Court suggests that the EPA could clarify matters through "administrative guidance," ante , at 1477, but so far the EPA has provided only limited advice and recently shifted its position, see 84 Fed. Reg. 16810 (2019) ; ante , at 1473 - 1474. In any event, the sort of " 'general rules' " that the Court hopes the EPA will promulgate are constitutionally suspect. See Department of Transportation v. Association of American Railroads , 575 U.S. 43, 67-87, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (THOMAS, J., concurring in judgment).
Despite giving minimal guidance as to how this case should be decided on remand, the majority speculates about whether a permit would be required in other factual circumstances. It poses the examples of a pipe that releases pollutants over navigable waters and a pipe that releases pollutants onto land near navigable waters. As an initial matter, I am not as sure as the majority that a "pollutant," as defined by the CWA, may be added to the air.[3] Even if the majority is correct that a permit is not required in these hypothetical cases, drawing the line at discharges to water is not so absurd as to undermine the most natural reading of the statute. In any event, it is unnecessary to decide these hypothetical cases today.
*1482 Finally, the Court speculates as to "those circumstances in which Congress intended to require a federal permit." Ante , at 1476. But we are not a superlegislature (or super-EPA) tasked with making good policy-assuming that is even what the Court accomplishes today. "Our job is to follow the text even if doing so will supposedly undercut a basic objective of the statute." Baker Botts L. L. P. v. ASARCO LLC , 576 U.S. 121, 135, 135 S.Ct. 2158, 192 L.Ed.2d 208 (2015) (internal quotation marks omitted).
II
I do agree with the Court on several points. First, the interpretation adopted by respondents and the Ninth Circuit is unsupportable. That interpretation-which would require permits for discharges that are " 'fairly traceable' " to, and proximately caused by, a point source-is atextual and unsettles the CWA's careful balance between federal regulation of point-source pollution and state regulation of nonpoint-source pollution. Ante , at 1470 - 1473.
Second, I agree that the interpretation adopted by petitioner and Justice ALITO reads the word "any" unnaturally, ante , at 1473 - 1474, although the majority appears to deploy that argument itself in another part of the opinion, ante, at 1475. Petitioner's and Justice ALITO's interpretation also gives insufficient weight to the meaning of "addition," see supra , at 1479 - 1480.
Third, I agree that the EPA's interpretation is not entitled to deference for at least two reasons: No party requests it, and the EPA's reading is not the best one. Ante , at 1474 - 1475. I add only that deference under Chevron U.S. A. Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), likely conflicts with the Vesting Clauses of the Constitution. See Baldwin v. United States , 589 U.S. ----, ---- - ----, 140 S.Ct. 690, 690-694, --- L.Ed.2d ---- (2020) (THOMAS, J., dissenting from denial of certiorari); Michigan v. EPA , 576 U.S. 743, 761-764, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015) (THOMAS, J., concurring); see also Perez v. Mortgage Bankers Assn. , 575 U.S. 92, 115-126, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015) (THOMAS, J., concurring in judgment).
Finally, I agree with the Court's implicit conclusion that Rapanos v. United States , 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006), does not resolve this case. That plurality opinion, which I joined, observed that lower courts have required a permit when pollutants pass through a chain of point sources. Id. , at 743-744, 126 S.Ct. 2208. But we expressly said in Rapanos that "we [did] not decide this issue." Id. , at 743, 126 S.Ct. 2208. We are not bound by dictum in a plurality opinion or by the lower court opinions it cited.
III
The best reading of the statute is that a "discharge" is the release of pollutants directly from a point source to navigable waters. The application of this interpretation to the undisputed facts of this case makes a remand unnecessary. Petitioner operates a wastewater treatment facility and injects treated wastewater into four underground injection control wells. All parties agree that the wastewater enters groundwater from the wells and does not directly enter navigable waters. Based on these undisputed facts, there is no "discharge," so I would reverse the judgment of the Ninth Circuit. I respectfully dissent.

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." § 1362(7). It defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged," excluding "agricultural stormwater discharges and return flows from irrigated agriculture." § 1362(14).

Justice KAVANAUGH believes that the Court's opinion provides enough guidance when it states that "[t]ime and distance will be the most important factors in most cases, but not necessarily every case ," ante, at 1477 (majority opinion) (emphasis added). See ante, at 1478 (concurring opinion). His hope for guidance appears misplaced. For all we know, these factors may not be the most important in 49 percent of cases. The majority's nonexhaustive seven-factor test "may aid in identifying relevant facts for analysis, but-like most multifactor tests-it leaves courts adrift once those facts have been identified." Dietz v. Bouldin , 579 U.S. ----, ----, 136 S.Ct. 1885, 1898, 195 L.Ed.2d 161 (2016) (THOMAS, J., dissenting); see also Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1186-1187 (1989) (noting that "when balancing is the mode of analysis, not much general guidance may be drawn from the opinion" and arguing that "totality of the circumstances tests and balancing modes of analysis" should "be avoided where possible").

The CWA defines a "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water," with certain exceptions. § 1362(6).