# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2021

Lyle W. Cayce
Clerk

No. 18-10545

STATE OF TEXAS; STATE OF KANSAS; STATE OF LOUISIANA;
STATE OF INDIANA; STATE OF WISCONSIN; STATE OF
NEBRASKA,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

CHARLES P. RETTIG, IN HIS OFFICIAL CAPACITY AS
COMMISSIONER OF INTERNAL REVENUE; UNITED STATES OF
AMERICA; UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES; UNITED STATES INTERNAL REVENUE
SERVICE; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

*Defendants—Appellants/Cross-Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:15-CV-151

ON PETITION FOR REHEARING EN BANC

(Opinion: Revised February 12, 2021, 5 CIR., 987 F.3D 518)

Before BARKSDALE, HAYNES, and WILLETT, *Circuit Judges*.[1]

PER CURIAM:

The court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Circ. R. 35), the petition for rehearing en banc is DENIED.

In the en banc poll, five judges voted in favor of rehearing (Judges Jones, Smith, Elrod, Ho, and Duncan), and eleven judges voted against rehearing (Chief Judge Owen, and Judges Stewart, Dennis, Southwick, Haynes, Graves, Higginson, Costa, Willett, Engelhardt, and Wilson).

---

[1] Judge Oldham did not participate in the consideration of the rehearing en banc.

Jᴀᴍᴇѕ C. Hᴏ, *Circuit Judge*, joined by Jᴏɴᴇѕ, Sᴍɪᴛʜ, Eʟʀᴏᴅ, and Dᴜɴᴄᴀɴ, *Circuit Judges*, dissenting from denial of rehearing en banc:

For those who believe in the text and original understanding of the Constitution, the panel decision is troubling for at least two different reasons.

First, the Constitution vests lawmaking power in the most politically accountable branch of our government—the Congress of the United States. Yet the panel blesses the placement of lawmaking power in purely private hands, wholly unaccountable to the people. That devalues the right to vote and desecrates the entire premise of our constitutional democracy—that our laws are supposed to be written by members of Congress elected by the American people, not by private interests pursuing unknown private agendas.

Second, judges swear an oath to uphold the Constitution, consistent of course with a judicial system based on precedent. That should mean that we decide every case faithful to the text and original understanding of the Constitution, to the maximum extent permitted by a faithful reading of binding precedent. Dutiful application of this standard is vital to respecting and restoring our nation's founding principles. But rather than apply this standard, the panel instead extends precedent unnecessarily, in a strained effort to uphold the uniquely unlawful delegation challenged here.

The Constitution vests "[a]ll legislative Powers herein granted" in Congress. U.S. Cᴏɴѕᴛ. art. I, § 1. And it makes clear that "any Bill . . . shall not be a Law" unless it has complied with the bicameralism and presentment requirements of Article I. U.S. Cᴏɴѕᴛ. art. I, § 7, cl. 2. These provisions do not permit Congress to delegate its lawmaking powers elsewhere, any more than they permit the President to delegate the power to sign legislation. *See*, *e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality opinion by Kagan, J.) ("The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.").

*See also*, *e.g.*, *Electronic Presentment and Return of Bills*, 35 Op. O.L.C. 51, 62 (2011) ("[T]he President . . . could not delegate his constitutional signing responsibility."); *Whether the President May Sign a Bill by Directing That His Signature Be Affixed to It*, 29 Op. O.L.C. 97, 124 (2005) (same).

This prohibition on delegation might seem inconvenient and inefficient to those who wish to maximize government's coercive power. But the purpose of the nondelegation doctrine is not to serve Congress, but to preserve liberty. *See*, *e.g.*, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) ("The principle that Congress cannot delegate away its vested powers exists to protect liberty.").

"'[B]icameralism and presentment make lawmaking difficult *by design*.'" *Id.* (quoting John F. Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 191, 202 (2007)). This "deliberative process was viewed by the Framers as a valuable feature, . . . not something to be lamented and evaded." *Id.* Indeed, "the framers went to great lengths to make lawmaking difficult," for "[a]n 'excess of law-making' was, in their words, one of 'the diseases to which our governments are most liable.'" *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J., dissenting) (quoting The Federalist No. 62 (James Madison)). The processes for new legislation may be "arduous," "but to the framers these were bulwarks of liberty." *Id.*

The modern administrative state illustrates what happens when we ignore the Constitution: Congress "pass[es] problems to the executive branch" and then engages in "finger-pointing" for any problems that might result. *Id.* at 2135. The bureaucracy triumphs—while democracy suffers.

That's why our Founders deliberately designed the legislative power to be exercised "only by elected representatives in a public process"—so that "the lines of accountability would be clear" and "[t]he sovereign people

would know, without ambiguity, whom to hold accountable." *Id.* at 2134. In short: When it comes to lawmaking, the buck stops with Congress.

Admittedly, the nondelegation doctrine has been more honored in the breach than in the observance. "[S]ince 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." *Id.* at 2130–31 (Alito, J., concurring).

So when the panel upheld the unlawful delegation of legislative power challenged in this case, it no doubt assumed it could invoke precedents reflecting the general dormancy and underenforcement of the nondelegation doctrine, and call it a day.

But fidelity to the Constitution requires much more than this. Critical features of the delegation challenged here make it categorically different from—and unsupportable under—current precedent.

To begin with, this case involves a delegation of lawmaking power, not to another governmental entity, but to private bodies wholly unaccountable to the citizenry. In addition, the delegation was effectuated not by Congress, but at the whim of an agency—and without Congressional blessing of any kind. There is no precedent that permits this kind of "double delegation" from Congress to public bureaucrats to private parties—no case cited by the panel or the parties, and no case that I have independently uncovered.

To the contrary, the Supreme Court has made clear that delegation to "private persons" is "legislative delegation in its *most obnoxious form*." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (emphasis added). "[F]or it is not even delegation to an official or an official body." *Id.* Delegation of legislative power to private entities is "unknown to our law" and "utterly inconsistent with the constitutional prerogatives and duties of Congress." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

After all, "[w]hen it comes to [delegating to] private entities, . . . there is not even a fig leaf of constitutional justification." *Ass'n of Am. R.Rs.*, 575 U.S. at 62 (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* (citations omitted). Indeed, "[e]ven the United States accepts that Congress 'cannot delegate regulatory authority to a private entity.'" *Id.* at 61.

At bottom, the regulation challenged here is uniquely offensive to the Constitution—and unsupported by precedent—for three reasons: (1) It subdelegates substantive lawmaking power, rather than some minor factual determination or ministerial task; (2) the subdelegation is authorized by an administrative agency, rather than by Congress; and (3) the agency is subdelegating power to a private entity, rather than to another governmental entity that is at least minimally accountable to the public in some way.

Not a single one of the precedents cited by the panel involves this toxic combination of constitutional abnormalities. Not one of them prevents us from enforcing the Constitution and the democratically accountable government for which it stands.

I dissent from the denial of rehearing en banc. The right to vote means nothing if we abandon our constitutional commitments and allow the real work of lawmaking to be exercised by private interests colluding with agency bureaucrats, rather than by elected officials accountable to the American voter.[1]

---

[1] *See*, *e.g.*, Philip Hamburger, Is Administrative Law Unlawful? 369 (2014) ("[T]he expansion of the electorate has been accompanied by the growth of administrative law . . . . One of the extraordinary achievements of American life over the past two centuries has been to make the theory of consensual government a reality. Yet when consensual government became a reality, the administrative state undermined that

**I.**

The Medicaid program provides financial assistance to low-income individuals so that they may obtain medical care. "States have two options for providing care to Medicaid beneficiaries: a 'fee-for-service' model and a managed-care model." *Texas v. Rettig*, 987 F.3d 518, 524 (5th Cir. 2021). "Under the . . . managed-care model, the state pays a third-party health insurer ('managed-care organization' or 'MCO') a monthly premium (the 'capitation rate') for each Medicaid beneficiary the MCO covers, and the MCO provides care to the beneficiary." *Id.*

In order for states to be reimbursed for these expenditures, MCO capitation rates must be "actuarially sound." 42 U.S.C. § 1396b(m)(2)(A)(iii), (xiii). In 2002, the Department of Health and Human Services (HHS) promulgated the "Certification Rule" to further delineate what it means for an MCO capitation rate to be "actuarially sound":

> (i) *Actuarially sound* capitation rates *means capitation rates that—*
>
> > (A) Have been developed in accordance with generally accepted actuarial principles and practices;

---

reality by shifting lawmaking away from people and their representatives . . . . [W]hether in 1870, 1920, or 1965 . . . each time, after representative government became more open to the people, legislative power increasingly has been sequestered to a part of government that is largely closed to them."); *id.* at 374–75 ("[A]lthough [members of the knowledge class] mostly supported expanded suffrage, they also supported the removal of legislative power to administrative agencies staffed by persons who shared their outlook. The development of administrative power thus . . . must be recognized as a sociological problem—indeed, a profoundly disturbing shift of power. As soon as the people secured the power to vote, a new class cordoned off for themselves a sort of legislative power that they could exercise without representation.").

> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; *and*

> (C) *Have been certified*, as meeting the requirements of this paragraph (c), *by actuaries who* meet the qualification standards established by the American Academy of Actuaries and *follow the practice standards established by the Actuarial Standards Board.*

42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002) (emphases added).[2]

The Actuarial Standards Board is not a governmental entity accountable to the American people. It is a private organization that sets practice standards for private actuaries certified by the private American Academy of Actuaries (AAA). Yet the Certification Rule empowers the Board to determine the regulatory standard for whether a capitation rate is "actuarially sound," by allowing the Board to dictate the "practice standards" that an actuary must follow in so certifying the rate. *Id.* And other private entities—AAA-qualified private actuaries—determine whether a particular capitation rate meets the Board's private standards. *Id.*

One such privately promulgated "practice standard" is the requirement that capitation rates "certified in accordance with 42 CFR 438.6(c)" "provide for all reasonable, appropriate, and attainable costs," "includ[ing] . . . government-mandated assessments, fees, and taxes." *Rettig*, 987 F.3d at 525–26. It is the issuance of this practice standard in 2015

---

[2] The Certification Rule has since been recodified into multiple provisions. 42 C.F.R. § 438.4 now states that "[t]o be approved by [the Centers for Medicare and Medicaid Services], capitation rates must . . . [b]e certified by an actuary as meeting the applicable requirements," while § 438.2 defines "[a]ctuary" as "an individual who meets the qualification standards established by the American Academy of Actuaries . . . and follows the practice standards established by the Actuarial Standards Board."

that gives rise to the instant case. *Id.* With the issuance of this private rule, the Plaintiff States suddenly had a new legal obligation to account for (and thus pay) a new "Provider Fee"—a "cost" (specifically, a "government-mandated . . . tax[]") incurred by certain MCOs. *See id.* at 528–29.

In October 2015, the State of Texas filed suit, joined by Indiana, Kansas, Louisiana, Nebraska, and Wisconsin, challenging the validity of both the Provider Fee itself and the Certification Rule that enabled a private entity to impose the Provider Fee. They sought various injunctive and declaratory remedies to relieve them from the burden of paying the Fee. Most relevant here, Plaintiffs claimed that the Certification Rule violates the nondelegation doctrine. The district court agreed. *Texas v. United States*, 300 F. Supp. 3d 810, 820 (N.D. Tex. 2018).

A panel of this court reversed. First, the panel held that there is no subdelegation at all because "[c]ertification by a qualified actuary who applies the Board's standards is reasonably connected to ensuring actuarially sound rates," and the private parties "have institutional expertise in actuarial principles and practices." *Rettig*, 987 F.3d at 531. Second, the panel held that "even assuming arguendo that HHS subdelegated authority to private entities, such subdelegations were not unlawful" because HHS (the panel claimed) "reviewed and accepted" the Board's standards and retained "the ultimate authority to approve a state's contract," "superintend[ing]" the approval process "in every respect." *Id.* at 532–33.

## II.

As discussed, the Constitution vests legislative power in Congress and does not permit delegation of that power—especially not to private parties. *Ante*, at 1–4. The panel responds by invoking various precedents. But at the very most, current precedent allows only Congress itself to involve private parties in the rulemaking process. *See Currin v. Wallace*, 306 U.S. 1, 15–16

(1939) (allowing Congress to condition agency action on private approval); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940) (allowing Congress to permit private parties to propose prices and regulations for agency approval).

There is good reason to limit these precedents to only those delegations authorized by Congress itself. Congress has express constitutional authority to legislate. U.S. CONST. art. I, § 1. And it is directly accountable to the American people. Neither is true of administrative agencies. As our sister circuit once observed, "when an agency delegates power to outside parties, lines of accountability may blur, undermining an important democratic check on government decision-making . . . . In short, subdelegation to outside entities aggravates the risk of policy drift inherent in any principal-agent relationship." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565–66 (D.C. Cir. 2004). "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

The Certification Rule plainly violates the private nondelegation doctrine. First, it delegates to a private entity the power to determine what constitutes an "actuarially sound" capitation rate. But Congress gave HHS no authority to turn this decision over to a private entity such as the Board. Moreover, there is no agency review of the Board's established "practice standards." If HHS disagrees with the Board's standards regarding capitation rates, its only recourse is to amend or repeal the rule delegating power to the Board in the first place. HHS has thus semi-permanently subjugated its regulatory power to that of the Board.

Second, there is no agency review of capitation rates unless and until they are approved by the private actuaries. The rule itself indicates that the Centers for Medicare and Medicaid Services (CMS) will not review an MCO

contract before these actuaries confirm the capitation rates' actuarial soundness. *See* 42 C.F.R. § 438.6(c)(1)(i)(C) (2002) ("Actuarially sound capitation rates . . . *[h]ave been certified* . . . by actuaries who . . . follow the practice standards established by the . . . Board.") (emphasis added). And the record confirms that CMS does not in fact review an MCO contract unless and until private parties have blessed the capitation rates. *See* Declaration of Christopher J. Truffer at 10 ("*[T]he state actuary must certify the rates* . . . . *Next*, a state sends a contract . . . to the appropriate . . . Office . . . , and the CMS actuarial review process *begins*. *After* ensuring that the documentation . . . contains the rate certification, . . . the [office] forwards the contract package to the Center for Medicaid and CHIP Services.") (emphases added)).

So before CMS even *begins* to exercise its own judgment and determine whether a rate meets the standards promulgated by the Board, private actuaries may apply the Board's private standards and determine that a capitation rate is *not* actuarially sound. In such cases, the agency's review process ends before it ever begins.

Under the Certification Rule, then, HHS neither sets the regulatory standard nor exercises final authority over the application of that standard. Private actors wield "final reviewing authority." *Rettig*, 987 F.3d at 532–33. They act as veto-gates that categorically preclude agency review—whether it's review of the "actuarially sound" standard itself, the determination that a capitation rate complies with that standard, or both. The Constitution forbids such delegations of government power to private entities.

## III.

The panel offers two arguments for why the Constitution permits the Certification Rule. Neither is persuasive.

## A.

First, the panel denies that there is any subdelegation at all. It cites the D.C. Circuit's decision in *Telecom* for the proposition that "an agency does not improperly subdelegate its authority when it 'reasonabl[y] condition[s]' federal approval on an outside party's determination of some issue," because "such conditions only amount to legitimate requests for input." *Rettig*, 987 F.3d at 531.

But the panel misreads *Telecom*. For starters, that case *rejected* an agency's unauthorized subdelegation of legal determinations. 359 F.3d at 567–68. And it had nothing at all to do with an agency delegating its substantive rulemaking power.

What's more, *Telecom* makes clear that any "subdelegation[] to outside parties [is] assumed to be improper absent an affirmative showing of congressional authorization." *Id.* at 565. *See also id.* at 566 ("A general delegation of decision-making authority to a federal administrative agency does *not*, in the ordinary course of things, include the power to subdelegate that authority beyond federal subordinates.").

In other words, under *Telecom*, at most only Congress may involve private parties in agency decision-making—an agency does not get to make that decision itself.

To be sure, the panel notes that, under *Telecom*, "specific types of legitimate outside party input into agency decision-making processes" do not amount to "subdelegation[s] of decision-making authority"—such as "establishing a reasonable condition for granting federal approval." *Id.* But *Telecom* limited this principle to *governmental* conditions—determinations by

"state, local, or tribal government[s]." *Id.* at 567. It endorsed no such principle with respect to private parties.[3]

And it's clear why. In the cases cited in *Telecom*, the "reasonable connection between the outside entity's decision and the federal agency's determination" was patently obvious and justified—there was simply no reason for the agency to approve a federal permit if the state (in the case of *United States v. Matherson*, 367 F. Supp. 779 (E.D.N.Y. 1973)) or tribal entity (in the case of *Southern Pacific Transportation Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983)) was going to prevent the petitioner from engaging in the regulated activity anyway. So the agencies weren't subordinating their authority to outside entities—they were refusing to waste agency resources on futile approvals. *See Matherson*, 367 F. Supp. at 782 ("[I]t is apparent that a vehicular permit from the National Seashore is of little value without the corresponding vehicular permit from the appropriate local municipality . . . . [A]n individual holding only a National Seashore vehicular permit would be prohibited from traversing state land and thereby be precluded from ever reaching the National Seashore by motor vehicle. The promulgation of [the regulation] has foreclosed the possibility of such an anomaly ever existing."); *Southern Pacific*, 700 F.2d at 556 ("The regulation at issue is not an abdication of the Secretary's power to administer the 1899 Act but rather an effort by the Secretary to incorporate into the decision-making process the wishes of a body with independent authority over the affected lands.").

---

[3] The panel claims that, under *Telecom*, it does not matter whether an agency is conditioning its approval on that of a government entity or a private party. *Rettig*, 987 F.3d at 531 n.10. But *Telecom* equated governmental and private entities only to say that an unauthorized subdelegation to either is invalid: "[F]ederal agency officials . . . may not subdelegate to outside entities—*private or sovereign—absent affirmative evidence of authority to do so*." 359 F.3d at 566 (emphasis added). And it is undisputed that Congress gave HHS no such authority here.

The situation here could not be more different. The private Board and private actuaries would have no say at all in the approval of capitation rates or MCO contracts but for HHS's decision to hand them its rulemaking and review powers in the first place.

So the Certification Rule is plainly unconstitutional under *Telecom*. "Congress has not delegated to [HHS] the authority to subdelegate [the actuarial soundness requirement] to outside parties." 359 F.3d at 566. And "[i]n contrast to [*Matherson* and *Southern Pacific*], where an agency with broad permitting authority . . . adopted an obviously relevant local [government] concern as an element of its decision process," HHS has not only "delegated to another [private] actor almost the entire determination of whether a specific statutory requirement . . . has been satisfied," *id.* at 567— it has even granted a private party the power to *define* the statutory requirement in the first place.[4]

**B.**

Second, the panel argues that, if there is a subdelegation here, it's permissible under Supreme Court and circuit precedent. But all the panel's authorities are inapposite.

---

[4] The panel also invokes *Louisiana Forestry Association v. Secretary of United States Department of Labor*, 745 F.3d 653 (3rd Cir. 2014). *Rettig*, 987 F.3d at 531 & n.10. But the statute in that case specifically granted the Department of Homeland Security (DHS) the authority to "determine[]" an alien's status "after consultation with appropriate agencies of the Government." *La. Forestry Ass'n*, 745 F.3d at 660. So of course DHS's decision to seek the "advice" of the Department of Labor in the form of a labor certification was not an unconstitutional subdelegation. It was one agency *acting pursuant to congressional authorization* to enlist the help of another agency in making a legal determination. There is no serious way to analogize the scheme in that case to the Certification Rule. Here, there is no statutory language granting HHS authority to give the *private* Board (or anyone else) *rulemaking power* to *craft* the legal standard.

The panel first invokes *Adkins*. *Rettig*, 987 F.3d at 532. But as noted, in *Adkins* it was Congress itself, not the agency, that enlisted the assistance of private parties in rulemaking. As our sister circuit has noted, "*Adkins . . .* affirmed a modest principle: *Congress* may formalize the role of private parties in proposing regulations." *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013), *rev'd on other grounds by Ass'n of Am. RRs.*, 575 U.S. 43 (emphasis added). *See also Telecom*, 359 F.3d at 565 ("[S]ubdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization.").

As explained, it is one thing to bless a Congressional decision to involve private parties in the rulemaking process. It is quite another to allow an agency—already acting pursuant to delegated power—to *re*-delegate that power out to a private entity. *See, e.g.*, *Gundy*, 139 S. Ct. at 2123 (plurality opinion by Kagan, J.) ("Accompanying [Article I, section 1's] assignment of power to Congress is a bar on its further delegation. Congress, this Court explained early on, may not transfer to another branch 'powers which are strictly and exclusively legislative.'") (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) ("Congress has delegated rulemaking power, and all that typically goes with it, to the agency alone.").

Moreover, the private parties in *Adkins* truly "function[ed] subordinately to the Commission," 310 U.S. at 399—serving as merely "an aid" that "*propose[d]*" minimum prices and regulations. *Id.* at 388 (emphasis added). The agency exercised "pervasive surveillance and authority," including the power to "approve[], disapprove[], or modif[y]" the industry proposals. *Id.* It was therefore the agency, and "not the [private actors]," that set the regulations. *Id.* at 399. Ultimately, "*Adkins . . .* affirmed a modest principle: Congress may formalize the role of private parties in proposing regulations *so long as that role is merely 'as an aid'* to a government agency that

retains the discretion to 'approve[], disapprove[], or modif[y]' them." *Ass'n of Am. R.Rs.*, 721 F.3d at 671 (emphasis added).

Here, by contrast, HHS has delegated to the Board the power to *define* actuarial soundness. And that power is reviewable only in the sense that the agency can amend or repeal the Certification Rule altogether. So absent new rulemaking, the Board's practice standards and the actuaries' certifications can prevent a state's capitation rate and associated MCO contract from ever reaching CMS for review. In short, while the instant scheme arguably allows HHS to "approve[]" private standards and actuarial certifications, it emphatically does not leave HHS free to "disapprove[] or modif[y]" them. *Id.*

The panel also cites *Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974). But *Sierra Club* did not decide whether an agency was unconstitutionally re-delegating its delegated rulemaking powers. Rather, it questioned whether an agency was "abdicat[ing] its statutory duties [under the National Environmental Policy Act] by reflexively rubber stamping a[n impact] statement prepared by others." *Id.* at 59.

At most, then, *Sierra Club* tells us how much "fact-finding" an agency can delegate. *See Telecom*, 359 F.3d at 567 ("[T]here is some authority for the view that a federal agency may use an outside entity, such as a state agency or a private contractor, to provide the agency with factual information."). There, we allowed a private developer to assist an agency in compiling studies that were conditions precedent to federal approval. *See Sierra Club* at 47, 59. So a private party was *assisting* the agency in determining the *facts* underlying the agency's decision to exercise government power. That is a far cry from allowing private parties to both define and apply a legal standard, and to do so without congressional authorization or agency review.

16

In any event, the panel cites *Sierra Club* for the proposition that there is no impermissible subdelegation where an agency "retains final reviewing authority," and "independently perform[s] its reviewing, analytical and judgmental functions." *Rettig*, 987 F.3d at 532. But again, HHS doesn't review the Board's practice standards, or the capitation rates rejected by private actuaries. So even if *Sierra Club* could justify an unauthorized subdelegation of substantive rulemaking power, its standard hasn't been met.

The panel's reliance on *Louisiana Public Service Commission v. FERC*, 761 F.3d 540 (5th Cir. 2014), is unavailing for the same reason. No matter how many times the panel claims otherwise, HHS has never "reviewed and accepted" the Board's practice standards or the actuaries' rejected capitation rates—let alone "continue[d] to exercise oversight" over those actions. *Id.* at 552. It just made a one-time decision to hand the private parties a blank check.

In the end, then, the only "final reviewing authority" HHS retains is the ability to issue a new rule.

Incredibly, the panel is fine with this: "[A]ny state dissatisfied with the Board's practice standards can petition HHS for 'amendment[] or repeal' of the . . . Rule's requirement that the Board's practice standards be followed." *Rettig*, 987 F.3d at 532 n.13 (quoting 5 U.S.C. § 553(e)). But by that logic, *any* agency subdelegation of rulemaking power is permissible. After all, any agency can always claw back its delegated power by issuing a new rule. *See Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2nd Cir. 2008) ("If all it reserves for itself is 'the extreme remedy of totally terminating the [delegation agreement],' an agency abdicates its 'final reviewing authority.'") (alteration in original) (citation omitted). But that would render the nondelegation doctrine a dead letter. We might as well say that Congress can never violate the nondelegation doctrine, because the

American people can always petition Congress to pass a new law and claw back its lawmaking power from an agency.[5]

## IV.

As judges, we have sworn an oath to uphold the Constitution. So if we are forced to choose between upholding the Constitution and extending precedent in direct conflict with the Constitution, the choice should be clear: "[O]ur duty [is] to apply the Constitution—not extend precedent." *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116 (9th Cir. 2020) (Bumatay, J.,

---

[5] According to the panel, holding the Certification Rule unconstitutional would also "jeopardize over a thousand regulations promulgated by federal agencies." *Rettig*, 987 F.3d at 532 n.11. But this collapses the distinction between the completely legitimate practice of codifying preexisting private standards and the novel, unconstitutional practice of handing private parties a blank check to fill (and amend) at their leisure.

As the panel notes, it is a "common and accepted practice" for agencies to incorporate by reference standards established by private organizations. *See id.* at 531–32 (citing *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018)). But this just tells us what HHS could have done in this case—not that what HHS *did* was okay. In *American Society*, the agencies exercised their rulemaking power to approve fixed, preexisting private standards. The standards were not automatically updated by the unilateral action of those outside entities. *See, e.g.*, 896 F.3d at 443 (describing a statute requiring the Secretary of Energy to decide whether to adopt revisions to incorporated materials); *id.* at 447 ("[W]e need not determine what happens when a regulation or statute *is revised to incorporate newer versions* of a particular standard.") (emphasis added); *id.* at 450 (explaining that the 2011 National Electrical Code had been incorporated into a power source regulation, "but not the 2014 edition"). *See also* Office of Mgmt. & Budget, Exec. Office of the President, *OMB Circular A-119: Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities* 4 (2016) (requiring agencies "to ensure[] . . . that regulations incorporating standards by reference are updated on a timely basis").

To say that HHS can empower the Board to write whatever standards it chooses because it "could achieve *exactly the same result* by promulgating regulations . . . adopt[ing] the . . . Board's standards," *Rettig*, 987 F.3d at 532, is to say that process doesn't matter. But when it comes to the Constitution and the separation of powers, the ends do not justify the means. *Ante*, at 2.

dissenting from denial of rehearing en banc). "[F]idelity to original meaning counsels against further extension of [] suspect precedents." *Hester v. United States*, 139 S. Ct. 509, 509 (2019) (Alito, J., concurring in the denial of certiorari).

The Supreme Court has repeatedly applied this principle when confronted with the choice between fidelity to the Constitution and an otherwise logical extension of its own precedent. *See*, *e.g.*, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) ("The question . . . is whether to extend those precedents to the 'new situation' before us, namely an independent agency led by a single Director and vested with significant executive power. We decline to do so. Such an agency has no basis in history and no place in our constitutional structure.") (citation omitted); *id.* at 2211 ("A decade ago, we declined to extend Congress's authority to limit the President's removal power to a new situation, never before confronted by the Court. We do the same today.") (referring to *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)); *Hernandez v. Mesa*, 140 S. Ct. 735, 749 (2020) ("In sum, this case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers.").

We should do the same. "As inferior court judges, we are bound by Supreme Court precedent. Yet[] . . . judges also have a 'duty to interpret the Constitution in light of its text, structure, and original understanding.'" *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring)). "While we must faithfully follow [Supreme Court] precedent . . . , '[w]e should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history.'" *Id.* (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 698 (D.C. Cir. 2008)

(Kavanaugh, J., dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010)).  *See also*, *e.g.*, *Alvarez v. City of Brownsville*, 904 F.3d 382, 401 (5th Cir. 2018) (en banc) (Ho, J., concurring) (noting that an important purpose of rehearing en banc is "to better align our precedents with the text and original understanding of the Constitution" "where the Supreme Court has not yet ruled").

\* \* \*

Our Founders fought a war to defend the principle of "no taxation without representation."  And that is precisely the principle Plaintiffs seek to vindicate today.  The federal government forces them to pay nearly half a billion dollars—not by an act of their elected representatives in Congress, but by private entities acting in collusion with unelected public bureaucrats.

The Constitution forbids this result.  And no precedent requires it.  I respectfully dissent from the denial of rehearing en banc.