Justice THOMAS, dissenting.
*2037 Three Committees of the U. S. House of Representatives issued subpoenas to several accounting and financial firms to obtain the personal financial records of the President, his family, and several of his business entities. The Committees do not argue that these subpoenas were issued pursuant to the House's impeachment power. Instead, they argue that the subpoenas are a valid exercise of their legislative powers.
Petitioners challenge the validity of these subpoenas. In doing so, they call into question our precedents to the extent that they allow Congress to issue legislative subpoenas for the President's private, nonofficial documents. I would hold that Congress has no power to issue a legislative subpoena for private, nonofficial documents-whether they belong to the President or not. Congress may be able to obtain these documents as part of an investigation of the President, but to do so, it must proceed under the impeachment power. Accordingly, I would reverse the judgments of the Courts of Appeals.
I
I begin with the Committees' claim that the House's legislative powers include the implied power to issue legislative subpoenas. Although the Founders understood that the enumerated powers in the Constitution included implied powers, the Committees' test for the scope of those powers is too broad.
"The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison , 1 Cranch 137, 176, 5 U.S. 137, 2 L.Ed. 60 (1803). The structure of limited and enumerated powers in our Constitution denotes that "[o]ur system of government rests on one overriding principle: All power stems from the consent of the people." U. S. Term Limits, Inc. v. Thornton , 514 U.S. 779, 846, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (THOMAS, J., dissenting). As a result, Congress may exercise only those powers given by the people of the States through the Constitution.
The Founders nevertheless understood that an enumerated power could necessarily bring with it implied powers. The idea of implied powers usually arises in the context of the Necessary and Proper Clause, which gives Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, § 8, cl. 18. As I have previously explained, the Necessary and Proper Clause simply "made explicit what was already implicit in the grant of each enumerated power." United States v. Comstock , 560 U.S. 126, 161, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (dissenting opinion). That is, "the grant of a general power includes the grant of incidental powers for carrying it out." Bray, "Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution, 102 Va. L. Rev. 687, 741 (2016).
The scope of these implied powers is very limited. The Constitution does not sweep in powers "of inferior importance, merely because they are inferior." McCulloch v. Maryland , 4 Wheat. 316, 408, 4 L.Ed. 579 (1819). Instead, Congress "can claim no powers which are not granted to it by the constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." Martin v. Hunter's Lessee , 1 Wheat. 304, 326, 4 L.Ed. 97 (1816). In sum, while the Committees' theory of an implied power is not categorically wrong, that power *2038 must be necessarily implied from an enumerated power.
II
At the time of the founding, the power to subpoena private, nonofficial documents was not included by necessary implication in any of Congress' legislative powers. This understanding persisted for decades and is consistent with the Court's first decision addressing legislative subpoenas, Kilbourn v. Thompson , 103 U.S. 168, 26 L.Ed. 377 (1881). The test that this Court created in McGrain v. Daugherty , 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927), and the majority's variation on that standard today, are without support as applied to private, nonofficial documents.[1]
A
The Committees argue that Congress wields the same investigatory powers that the British Parliament did at the time of the founding. But this claim overlooks one of the fundamental differences between our Government and the British Government: Parliament was supreme. Congress is not.
I have previously explained that "the founding generation did not subscribe to Blackstone's view of parliamentary supremacy." Department of Transportation v. Association of American Railroads , 575 U.S. 43, 74, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015) (opinion concurring in judgment). "Parliament's violations of the law of the land had been a significant complaint of the American Revolution." Id., at 74-75, 135 S.Ct. 1225. "And experiments in legislative supremacy in the States had confirmed the idea that even the legislature must be made subject to the law." Id. , at 75, 135 S.Ct. 1225.
James Wilson, signer of the Constitution and future Justice, explained this difference to the Pennsylvania ratifying convention: "Blackstone will tell you, that in Britain [the supreme power] is lodged in the British Parliament; and I believe there is no writer on the other side of the Atlantic" who thought otherwise. 2 Documentary History of the Ratification of the Constitution 471 (M. Jensen ed. 1976) (Documentary History). In the United States, however, "the supreme, absolute, and uncontrollable authority, remains with the people." Id. , at 472. And "[t]he Constitution plainly sets forth the 'few and defined' powers that Congress may exercise." Comstock , 560 U.S. at 159, 130 S.Ct. 1949 (THOMAS, J., dissenting); see also McCulloch , 4 Wheat. at 405 ; Marbury , 1 Cranch at 176. This significant difference means that Parliament's powers and Congress' powers are not necessarily the same.
In fact, the plain text of the Constitution makes clear that they are not. The Constitution expressly denies to Congress some of the powers that Parliament exercised. Article I, for example, prohibits bills of attainder, § 9, cl. 3, which Parliament used to "sentenc[e] to death one or more specific persons." United States v. Brown , 381 U.S. 437, 441, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). A legislature can hardly be considered supreme if it lacks the power to pass bills of attainder, which Justice Story called the "highest power of sovereignty." 3 Commentaries on the Constitution of the United States § 1338, p. 210 (1833). Relatedly, the Constitution prohibits ex post facto laws, § 9, cl. 3, reinforcing the fact *2039 that Congress' power to punish is limited.[2] And in a system in which Congress is not supreme, the individual protections in the Bill of Rights, such as the prohibition on unreasonable searches and seizures, meaningfully constrain Congress' power to compel documents from private citizens. Cf. 1 St. George Tucker, Blackstone's Commentaries 203-205, n. § (1803); see also D. Currie, The Constitution in Congress: The Federalist Period, 1789-1801, p. 268 (1997).
Furthermore, Kilbourn -this Court's first decision on the constitutionality of legislative subpoenas-emphasized that Parliament had more powers than Congress. There, the congressional respondents relied on Parliament's investigatory power to support a legislative subpoena for testimony and documents. The Court rejected the analogy because the judicial powers of the House of Commons-the lower house of Parliament-exceeded the judicial functions of the House of Representatives. Kilbourn , supra, at 189. At bottom, Kilbourn recognized that legislative supremacy was decisively rejected in the framing and ratification of our Constitution, which casts doubt on the Committees' claim that they have power to issue legislative subpoenas to private parties.
B
The subpoenas in these cases also cannot be justified based on the practices of 18th-century American legislatures. Amici supporting the Committees resist this conclusion, but the examples they cite materially differ from the legislative subpoenas at issue here.
First, amici cite investigations in which legislatures sought to compel testimony from government officials on government matters. The subjects included military affairs, taxes, government finances, and the judiciary. Potts, Power of Legislative Bodies To Punish for Contempt, 74 U. Pa. L. Rev. 691, 708, 709, 710, 716-717 (1926) (Potts); see also E. Eberling, Congressional Investigations: A Study of the Origin and Development of the Power of Congress To Investigate and Punish for Contempt 18 (1928) (Eberling). But the information sought in these examples was official, not private. Underscoring this distinction, at least one revolutionary-era State Constitution permitted the legislature to "call for all public or official papers and records, and send for persons, whom they may judge necessary in the course of their inquiries, concerning affairs relating to the public interest." Md. Const., Art. X (1776) (emphasis added).
Second, 18th-century legislatures conducted nonlegislative investigations. For example, the New York colonial legislature tasked one committee with investigating a nuisance complaint and gave it the "power to send for persons, papers and records." Eberling 18; see also id. , at 19 (investigation of a government contract obtained by alleged wrongdoing); Potts 716 (investigation of armed resistance). But to describe this category is to distinguish it. Here, the Committees assert only a legislative purpose.
Third, colonial and state legislatures investigated and punished insults, libels, and bribery of members. For example, the Pennsylvania colonial assembly investigated "injurious charges, and slanderous Aspersions *2040 against the Conduct of the late Assembly" made by two individuals. Id. , at 710 (internal quotation marks omitted); see also id. , at 717; Eberling 20-21. But once again, to describe this category is to distinguish it because the subpoenas here are justified only as incidental to the power to legislate, not the power to punish libels or bribery. In short, none of the examples from 18th-century colonial and state history support a power to issue a legislative subpoena for private, nonofficial documents.
C
Given that Congress has no exact precursor in England or colonial America, founding-era congressional practice is especially informative about the scope of implied legislative powers. Thus, it is highly probative that no founding-era Congress issued a subpoena for private, nonofficial documents. Although respondents could not identify the first such legislative subpoena at oral argument, Tr. of Oral Arg. 56, Congress began issuing them by the end of the 1830s. However, the practice remained controversial in Congress and this Court throughout the first century of the Republic.
1
In an attempt to establish the power of Congress to issue legislative subpoenas, the Committees point to an investigation of Government affairs and an investigation under one of Congress' enumerated privileges. Both precedents are materially different from the subpoenas here.
In 1792, the House authorized a Committee to investigate a failed military expedition led by General Arthur St. Clair. 3 Hinds' Precedents of the House of Representatives of the United States § 1725, pp. 79-80 (1907) (Hinds). The Committee was "empowered to call for such persons, papers and records as may be necessary to assist their inquiries." Ibid. But the Committee never subpoenaed private, nonofficial documents, which is telling. Whereas a subpoena for Government documents does not implicate concerns about property rights or the Fourth Amendment "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," a subpoena for private, nonofficial documents raises those questions. Thus, the power to subpoena private documents, which the Committee did not exercise, is a far greater power and much less likely to be implied in Congress' legislative powers.
In 1832, the House investigated Representative Samuel Houston for assaulting Representative William Stanberry. Stanberry had accused Houston of collusion with Secretary of War John Eaton in connection with a bid for a Government contract, and the House initiated an investigation into the truthfulness of Stanberry's accusation. 8 Cong. Deb. 2550, 3022-3023 (1832). The House subpoenaed witnesses to testify, and one of them brought official correspondence between the Secretary of War and the President. H. R. Rep. No. 502, 22d Cong., 1st Sess. 64, 66-67 (1832). But official documents are obviously different from nonofficial documents. Moreover, the subpoenas were issued pursuant to the House's enumerated privilege of punishing its own Members, Art. I, § 5, not as part of its legislative powers. Because these subpoenas were not issued pursuant to a legislative power, they do not aid the Committees' case.
2
As late as 1827, a majority of the House declined to authorize the Committee on Manufactures to subpoena documents, amid concerns that it was unprecedented. During the debate over the resolution, one *2041 opponent remarked that "[t]here is no instance under this Government, within my recollection, where this power has been given for the mere purpose of enabling a committee of this House to adjust the details of an ordinary bill." 4 Cong. Deb. 865-866 (Rep. Strong); see also id. , at 862 (referring to "authority to bring any citizens of the United States ... whom they might choose to send for, and compel them to give answers to every inquiry which should be addressed to them" as "very extraordinary"). Another opponent stated that the Committee had requested a power that had "not heretofore been thought necessary to enable that Committee to acquire correct information." Id. , at 866 (Rep. Storrs). A third called it "not only novel and extraordinary, but wholly unnecessary." Id. , at 874 (Rep. Stewart); see also id. , at 884-885 (Rep. Wright). No supporter of the resolution offered a specific precedent for doing so, and the House ultimately authorized the Committee to send for persons only. Id. , at 889-890.
This debate is particularly significant because of the arguments made by both sides. Proponents made essentially the same arguments the Committees raise here-that the power to send for persons and papers was necessary to inform Congress as it legislated. Id. , at 871 (Rep. Livingston). Opponents argued that this power was not part of any legislative function. Id. , at 865-866 (Rep. Strong). They also argued that the House of Commons provided no precedent because Congress was a body of limited and enumerated powers. Id. , at 882 (Rep. Wood). And in the end, the opponents prevailed. Thus, through 1827, the idea that Congress had the implied power to issue subpoenas for private documents was considered "novel," "extraordinary," and "unnecessary." Id. , at 874.
3
By the end of the 1830s, Congress began issuing legislative subpoenas for private, nonofficial documents. See Eberling 123-126. Still, the power to demand information from private parties during legislative investigations remained controversial.
In 1832, the House authorized a Committee to "inspect the books, and to examine into the proceedings of the Bank of the United States, to report thereon, and to report whether the provisions of its charter have been violated or not." 8 Cong. Deb. 2160, 2164. The House gave the Committee "power to send for persons and papers." Id., at 2160. The power to inspect the books of the Bank of the United States is not itself a clear example of a legislative subpoena for private, nonofficial documents, because the Bank was a federally chartered corporation and was required to allow Congress to inspect its books. App. to 8 Cong. Deb. 54 (1833). The investigation itself appears to have ranged more widely, however, leading Congressman John Quincy Adams to criticize
"investigations which must necessarily implicate not only the president and directors of the bank, and their proceedings, but the rights, the interests, the fortunes, and the reputation of individuals not responsible for those proceedings, and whom neither the committee nor the House had the power to try, or even accuse before any other tribunal." Ibid.
Adams continued that such an investigation "bears all the exceptionable and odious properties of general warrants and domiciliary visits." Ibid. He also objected that the Committee's investigation of the Bank was tantamount to punishment and thus was in tension with the constitutional prohibitions on "passing any bill of attainder [or] ex post facto law." Id., at 60. Thus, even when Congress authorized a Committee *2042 to send for private papers, the constitutionality of doing so was questioned.
An 1859 Senate investigation, which the Court of Appeals cited as precedent, underscores that legislative subpoenas to private parties were a 19th-century innovation. Following abolitionist John Brown's raid at Harper's Ferry, Senate Democrats opened an investigation apparently designed to embarrass opponents of slavery. As part of the investigation, they called private individuals to testify. Senator Charles Sumner, a leading opponent of slavery, railed against the proceedings:
"I know it is said that this power is necessary in aid of legislation . I deny the necessity. Convenient , at times, it may be; but necessary , never . We do not drag the members of the Cabinet or the President to testify before a committee in aid of legislation ; but I say, without hesitation, they can claim no immunity which does not belong equally to the humblest citizen." Cong. Globe, 36th Cong., 1st Sess., 3007 (1860).
Sumner also addressed the matter of Parliament's powers, calling them "more or less inapplicable" because "[w]e live under a written Constitution, with certain specified powers; and all these are restrained by the tenth amendment." Ibid. For Sumner, as for Adams, the power to issue legislative subpoenas to private parties was a "dangerous absurdity" with no basis in the text or history of the Constitution. Ibid.[3]
4
When this Court first addressed a legislative subpoena, it refused to uphold it. After casting doubt on legislative subpoenas generally, the Court in Kilbourn v. Thompson , 103 U.S. 168, held that the subpoena at issue was unlawful because it sought to investigate private conduct.
In 1876, the House created a special Committee to investigate the failure of a major bank, which caused the loss of federal funds and related to financial speculation in the District of Columbia. Id. , at 171. The Committee issued a subpoena to Kilbourn, an employee of the bank. Id., at 172. When he refused to answer questions or produce documents, the House held him in contempt and arrested him. Id. , at 173. After his release, he sued the Speaker, several Committee members, and the Sergeant at Arms for damages.
The Court discussed the arguments for an "impli[ed]" power to issue legislative subpoenas. Id. , at 183. As the Court saw it, there were two arguments: "1, its exercise by the House of Commons of England ... and, 2d, the necessity of such a power to enable the two Houses of Congress to perform the duties and exercise the powers which the Constitution has conferred on them." Ibid.
The Court rejected the first argument. It found "no difference of opinion as to [the] origin" of the House of Commons' subpoena power:
"[T]he two Houses of Parliament were each courts of judicature originally, which, though divested by usage, and by statute, probably, of many of their judicial functions, have yet retained so much of that power as enables them, like any other court, to punish for a contempt of these privileges and authority that the power rests." Id., at 184.
Even after the division of Parliament into two houses, "[t]o the Commons was left the power of impeachment, and, perhaps, *2043 others of a judicial character, and jointly they exercised, until a very recent period, the power of passing bills of attainder for treason and other high crimes which are in their nature punishment for crime declared judicially by the High Court of Parliament." Ibid. By contrast, the House of Representatives "is in no sense a court, ... exercises no functions derived from its once having been a part of the highest court of the realm," and has no judicial functions beyond "punishing its own members and determining their election." Id. , at 189. The Court thus rejected the notion that Congress inherited from Parliament an implied power to issue legislative subpoenas.
The Court did not reach a conclusion on the second theory that a legislative subpoena power was necessary for Congress to carry out its legislative duties. But it observed that, based on British judicial opinions, not "much aid [is] given to the doctrine, that this power exists as one necessary to enable either House of Congress to exercise successfully their function of legislation." Ibid. The Court referred to a collection of 18th- and 19th-century English decisions grounding the Parliamentary subpoena power in that body's judicial origins. Id., at 184-189 (citing Burdett v. Abbott , 104 Eng. Rep. 501 (K. B. 1811); Brass Crosby's Case , 95 Eng. Rep. 1005 (C. P. 1771); Stockdale v. Hansard , 112 Eng. Rep. 1112 (K. B. 1839); and Kielley v. Carson , 13 Eng. Rep. 225 (P. C. 1841)). The Court placed particular emphasis on Kielley , in which the Privy Council held that the Legislative Assembly of Newfoundland lacked a power to punish for contempt. The Privy Council expressly stated that the House of Commons could punish for contempt
" 'not because it is a representative body with legislative functions, but by virtue of ancient usage and prescription ... which forms a part of the common law of the land, and according to which the High Court of Parliament before its division, and the Houses of Lords and Commons since, are invested with many privileges, that of punishment for contempt being one.' " Kilbourn , 103 U.S. at 188-189.
This Court also noted that the Privy Council "discusse[d] at length the necessity of this power in a legislative body for its protection, and to enable it to discharge its law-making functions, and decide[d] against the proposition." Id. , at 189. Although the Court did not have occasion to decide whether the legislative subpoena in that case was necessary to the exercise of Congress' legislative powers, its discussion strongly suggests the subpoena was unconstitutional.[4]
The Court instead based its decision on the fact that the subpoena at issue "ma[de] inquiry into the private affairs of the citizen." Id. , at 190. Such a power, the Court reasoned, "is judicial and not legislative," id. , at 193, and "no judicial power is vested in the Congress or either branch of it, save in the cases" of punishing Members, compelling Members' attendance, judging elections and qualifications, and impeachment and trial, id. , at 192-193. Notably, the Court found no indication that the House "avowed to impeach the secretary," or else "the whole aspect of the case would have been changed." Id. , at 193. Even though *2044 the Court decided Kilbourn narrowly, it clearly entertained substantial doubts about the constitutionality of legislative subpoenas for private documents.
D
Nearly half a century later, in McGrain v. Daugherty , the Court reached the question reserved in Kilbourn -whether Congress has the power to issue legislative subpoenas. It rejected Kilbourn 's reasoning and upheld the power to issue legislative subpoenas as long as they were relevant to a legislative power. Although McGrain involved oral testimony, the Court has since extended this test to subpoenas for private documents. The Committees rely on McGrain , but this line of cases misunderstands both the original meaning of Article I and the historical practice underlying it.
1
Shortly before Attorney General Harry Daugherty resigned in 1924, the Senate opened an investigation into his " 'alleged failure' " to prosecute monopolists, the protagonists of the Teapot Dome scandal, and " 'many others.' " McGrain , 273 U.S. at 151, 47 S.Ct. 319. The investigating Committee issued subpoenas to Daugherty's brother, Mally, who refused to comply and was arrested in Ohio for failure to testify. Id. , at 152-154. Mally petitioned for a writ of habeas corpus, and the District Court discharged him, based largely on Kilbourn . Ex parte Daugherty , 299 F. 620 (SD Ohio 1924). The Deputy Sergeant at Arms who arrested Mally directly appealed to this Court, which reversed.
The Court concluded that, "[i]n actual legislative practice[,] power to secure needed information by [investigating and compelling testimony] has long been treated as an attribute of the power to legislate." McGrain , 273 U.S. at 161, 47 S.Ct. 319. The Court specifically found that "[i]t was so regarded in the British Parliament and in the Colonial legislatures before the American Revolution" and that "a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures." Ibid. But the authority cited by the Court did not support that proposition. The Court cited the 1792 investigation of St. Clair's defeat, in which it appears no subpoena was issued, supra, at 2040 - 2041, and the 1859 Senate investigation of John Brown's raid on Harper's Ferry, which led to an impassioned debate. 273 U.S. at 162-164, 47 S.Ct. 319. Thus, for the reasons explained above, the examples relied on in McGrain are materially different from issuing a legislative subpoena for private, nonofficial documents. See supra, at 2040, 2041 - 2042.[5]
The Court acknowledged Kilbourn, but erroneously distinguished its discussion regarding the constitutionality of legislative subpoenas as immaterial dicta. McGrain , supra , at 170-171, 47 S.Ct. 319 (quoting Kilbourn , supra, at 189 ). The Court concluded that "the two houses of Congress, in their separate relations, possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective." McGrain , supra, at 173, 47 S.Ct. 319.
Instead of relying on Kilbourn 's analysis, McGrain developed a test that rested heavily on functional considerations. The Court wrote that "[a] legislative body cannot legislate wisely or effectively in the *2045 absence of information respecting the conditions which the legislation is intended to affect or change." 273 U.S. at 175, 47 S.Ct. 319. Because "mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete," "some means of compulsion are essential to obtain what is needed." Ibid.
The Court thus concluded that Congress could issue legislative subpoenas, provided that "the purpose for which the witness's testimony was sought was to obtain information in aid of the legislative function." Id., at 176, 47 S.Ct. 319. The Court has since applied this test to subpoenas for papers without any further analysis of the text or history of the Constitution. See Eastland v. United States Servicemen's Fund , 421 U.S. 491, 504-505, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). The majority today modifies that test for cases involving the President, but it leaves the core of the power untouched. Ante , at 2035 - 2036.
2
The opinion in McGrain lacks any foundation in text or history with respect to subpoenas for private, nonofficial documents. It fails to recognize that Congress, unlike Parliament, is not supreme. It does not cite any specific precedent for issuing legislative subpoenas for private documents from 18th-century colonial or state practice. And it identifies no founding-era legislative subpoenas for private documents.[6]
Since McGrain , the Court has pared back Congress' authority to compel testimony and documents. It has held that certain convictions of witnesses for contempt of Congress violated the Fifth Amendment. See Watkins v. United States , 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957) (Due Process Clause); Quinn v. United States , 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (Self-Incrimination Clause); see also Barenblatt v. United States , 360 U.S. 109, 153-154, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (Black, J., dissenting). It has also affirmed the reversal of a conviction on the ground that the Committee lacked authority to issue the subpoena. See United States v. Rumely , 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). And today, it creates a new four-part, nonexhaustive test for cases involving the President. Ante , at 2035 - 2036. Rather than continue our trend of trying to compensate for McGrain , I would simply decline to apply it in these cases because it is readily apparent that the Committees have no constitutional authority to subpoena private, nonofficial documents.
III
If the Committees wish to investigate alleged wrongdoing by the President and obtain documents from him, the Constitution provides Congress with a special mechanism for doing so: impeachment.[7]
A
It is often acknowledged, "if only half-heartedly honored," that one of the motivating *2046 principles of our Constitution is the separation of powers. Association of American Railroads , 575 U.S. at 74, 135 S.Ct. 1225 (THOMAS, J., concurring in judgment). The Framers recognized that there are three forms of governmental power: legislative, executive and judicial. The Framers also created three branches: Congress, the President, and the Judiciary. The three powers largely align with the three branches. To a limited extent, however, the Constitution contains "a partial intermixture of those departments for special purposes." The Federalist No. 66, p. 401 (C. Rossiter ed. 1961) (A. Hamilton). One of those special purposes is the system of checks and balances, and impeachment is one of those checks.
The Constitution grants the House "the sole Power of Impeachment," Art. I, § 2, cl. 5, and it specifies that the President may be impeached for "Treason, Bribery, or other high Crimes and Misdemeanors," Art. II, § 4. The founding generation understood impeachment as a check on Presidential abuses. In response to charges that impeachment "confounds legislative and judiciary authorities in the same body," Alexander Hamilton called it "an essential check in the hands of [Congress] upon the encroachments of the executive." The Federalist No. 66, at 401-402. And, in the Virginia ratifying convention, James Madison identified impeachment as a check on Presidential abuse of the treaty power. 10 Documentary History 1397.
B
The power to impeach includes a power to investigate and demand documents. Impeachments in the States often involved an investigation. In 1781, the Virginia Legislature began what Edmund Randolph called an "impeachment" of then-Governor Thomas Jefferson. P. Hoffer & N. Hull, Impeachment in America, 1635-1805, p. 85 (1984). This "most publicized and far-reaching impeachment inquiry for incompetence" included an " 'inquir[y] into the conduct of the executive of this state for the last two months.' " Ibid. The legislatures of New Jersey, id. , at 92, and Pennsylvania, id. , at 93-95, similarly investigated officials through impeachment proceedings.
Reinforcing this understanding, the founding generation repeatedly referred to impeachment as an "inquest." See 4 Debates on the Constitution 44 (J. Elliot ed. 1854) (speech of A. Maclaine) (referring to the House as "the grand inquest of the Union at large"); The Federalist No. 65, at 397 (Hamilton) (referring to the House as "a method of NATIONAL INQUEST "); 2 Records of the Federal Convention 154 (M. Farrand ed. 1911) (record from the Committee of Detail stating that "[t]he House of Representatives shall be the grand Inquest of this Nation; and all Impeachments shall be made by them"); see also Mass. Const., ch. 1, § 3, Art. VI (1780) (referring to the Massachusetts House of Representatives as "the Grand Inquest of this Commonwealth"). At the time, an "inquest" referred to an "[i]nquiry, especially that made by a Jury" or "the Jury itself." N. Bailey, Universal Etymological Dictionary (22d ed. 1770).
The Founders were also aware of the contemporaneous impeachment of Warren Hastings in England, in which the House of Commons heard witnesses before voting to impeach. P. Marshall, The Impeachment of Warren Hastings 40-41, 58 (1965). In the first impeachment under the new Constitution, Congressmen cited the Hastings impeachment as precedent for several points, including the power to take testimony before impeaching. 7 Annals of Cong. 456 (1797) (Rep. Rutledge); id. , at 459 (Rep. Sitgreaves); id., at 460 (Rep. Gallatin).
*2047 Other evidence from the 1790s confirms that the power to investigate includes the power to demand documents. When the House of Representatives sought documents related to the Jay Treaty from President George Washington, he refused to provide them on the ground that the House had no legislative powers relating to the ratification of treaties. 5 Annals of Cong. 760-762 (1796). But he carefully noted that "[i]t does not occur that the inspection of the papers asked for can be relative to any purpose under the cognizance of the House of Representatives, except that of an impeachment; which the resolution has not expressed." Id., at 760. In other words, he understood that the House can demand documents as part of its power to impeach.
This Court has also long recognized the power of the House to demand documents. Even as it questioned the power to issue legislative subpoenas, the Court in Kilbourn acknowledged the ability to "compel the attendance of witnesses, and their answer to proper questions" when "the question of ... impeachment is before either body acting in its appropriate sphere on that subject." 103 U.S. at 190.
I express no view today on the boundaries of the power to demand documents in connection with impeachment proceedings. But the power of impeachment provides the House with authority to investigate and hold accountable Presidents who commit high crimes or misdemeanors. That is the proper path by which the Committees should pursue their demands.
IV
For nearly two centuries, until the 1970s, Congress never attempted to subpoena documents to investigate wrongdoing by the President outside the context of impeachment. Congress investigated Presidents without opening impeachment proceedings. See, e.g., 2 Hinds § 1596, at 1043-1045 (President James Buchanan). But it never issued a subpoena for private, nonofficial documents as part of those non-impeachment inquiries. Perhaps most strikingly, one proposed request for official documents from the President was amended after objection so that it " 'requested' " them rather than " 'direct[ing]' " the President to provide them. 3 id. , § 1895, at 193.
Insisting that the House proceed through its impeachment power is not a mere formality. Unlike contempt, which is governed by the rules of each chamber, impeachment and removal constitutionally requires a majority vote by the House and a two-thirds vote by the Senate. Art. I, § 2, cl. 5; § 3, cl. 6. In addition, Congress has long thought it necessary to provide certain procedural safeguards to officials facing impeachment and removal. See, e.g. , 3 Annals of Cong. 903 (1793) (Rep. W. Smith). Finally, initiating impeachment proceedings signals to the public the gravity of seeking the removal of a constitutional officer at the head of a coordinate branch. 940 F.3d 710, 776 (CADC 2019) (Rao, J., dissenting).
* * *
Congress' legislative powers do not authorize it to engage in a nationwide inquisition with whatever resources it chooses to appropriate for itself. The majority's solution-a nonexhaustive four-factor test of uncertain origin-is better than nothing. But the power that Congress seeks to exercise here has even less basis in the Constitution than the majority supposes. I would reverse in full because the power to subpoena private, nonofficial documents is not a necessary implication of Congress' legislative powers. If Congress wishes to obtain these documents, it should proceed through the impeachment power. Accordingly, I respectfully dissent.

I express no opinion about the constitutionality of legislative subpoenas for other kinds of evidence.

The Constitution also enumerates a limited set of congressional privileges. Although I express no opinion on the question, at least one early commentator thought the canon of expressio unius meant that Congress had no unenumerated privileges, such as the power to hold nonmembers in contempt. 1 St. George Tucker, Blackstone's Commentaries 200, n. § (1803).

I note as well that Sumner expressly distinguished legislative subpoenas from subpoenas issued during "those inquiries which are in their nature preliminary to an impeachment." Cong. Globe, 36th Cong., 1st Sess., 3007 (1860).

According to Justice Miller's private letters, "a majority of the Court, including Miller himself, were of the opinion that neither House nor Senate had power to punish for contempt witnesses who refused to testify before investigating committees." T. Taylor, Grand Inquest: The Story of Congressional Investigations 49 (1955). Only Justice Miller's desire to " 'decid[e] no more than is necessary' " caused the Court to avoid the broader question. Ibid.

The Court also cited decisions between 1858 and 1913 from state courts and a Canadian court, none of which are persuasive evidence about the original meaning of the U. S. Constitution. McGrain , 273 U.S. at 165-167, 47 S.Ct. 319.

The Court further observed that Congress has long exercised the power to hold nonmembers in contempt for reasons other than failure to comply with a legislative subpoena. McGrain , supra, at 168-169, 47 S.Ct. 319. The earliest case it cited, Anderson v. Dunn , 6 Wheat. 204, 5 L.Ed. 242 (1821), relied on arguments about Congress' power of self-protection, id., at 226-227. Members of Congress defending the use of contempt for these other purposes made similar arguments about self-protection. 5 Annals of Cong. 181-182 (1795) (Rep. W. Smith); id., at 189 (Rep. I. Smith). But the failure to respond to a subpoena does not pose a fundamental threat to Congress' ability to exercise its powers.

I express no view on whether there are any limitations on the impeachment power that would prevent the House from subpoenaing the documents at issue.