**REVISED February 12, 2021**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 12, 2021

Lyle W. Cayce
Clerk

No. 18-10545

STATE OF TEXAS; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF INDIANA; STATE OF WISCONSIN; STATE OF NEBRASKA,

　　　　Plaintiffs - Appellees Cross-Appellants

v.

CHARLES P. RETTIG, in his Official Capacity as Commissioner of Internal Revenue; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES INTERNAL REVENUE SERVICE; ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

　　　　Defendants - Appellants Cross-Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:15-CV-151

Before BARKSDALE, HAYNES, and WILLETT, Circuit Judges.

HAYNES, Circuit Judge:

　　We withdraw our prior opinion of July 31, 2020, *Texas v. Rettig*, 968 F.3d 402 (5th Cir. 2020), and substitute the following.

　　This case involves constitutional challenges to Section 9010 of the Affordable Care Act (the "ACA") and statutory and constitutional challenges to

No. 18-10545

a U.S. Department of Health and Human Services ("HHS") administrative rule (the "Certification Rule"). Texas, Kansas, Louisiana, Indiana, Wisconsin, and Nebraska (the "States") sued the United States and its relevant agencies and officials (collectively, the "United States"), claiming that the Certification Rule and Section 9010 were unlawful. Both parties moved for summary judgment, and the district court granted both motions in part. The parties then cross-appealed. On the jurisdictional claims, we AFFIRM the district court's ruling that the States had standing, but we REVERSE the district court's ruling that the States' Administrative Procedure Act ("APA") claims were not time-barred and DISMISS those claims for lack of jurisdiction. On the merits, we AFFIRM the district court's judgment on the Section 9010 claims; however, we REVERSE the district court's judgment that the Certification Rule violated the nondelegation doctrine and RENDER judgment in favor of the United States. Because we hold that neither the Certification Rule nor Section 9010 are unlawful, we VACATE the district court's grant of equitable disgorgement to the States.

## I.    Background

### A.    Regulatory Background

In 1965, the Medicaid Act[1] "established the Medicaid program as a joint Federal and State program for providing financial assistance to individuals with low incomes to enable them to receive medical care." *See* Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989, 40,989 (June 14, 2002) [hereinafter "2002 Final Rule"]. The federal

---

[1] 42 U.S.C. §§ 1396–1396w-5.

government "provid[es] matching funds to State agencies to pay for a portion of the costs of providing health care to Medicaid beneficiaries."[2] *Id.*

States have two options for providing care to Medicaid beneficiaries: a "fee-for-service" model and a managed-care model. *Id.* Under the fee-for-service model, a doctor who treats a Medicaid beneficiary submits a reimbursement request to the state Medicaid agency. *Id.* The state pays the bill after confirming the individual's eligibility and need for service. *See id.* Then the state seeks reimbursement from the federal government for a percentage of the cost. *See* 42 U.S.C. § 1396b(a).

Under the more widely used managed-care model, the state pays a third-party health insurer ("managed-care organization" or "MCO") a monthly premium (the "capitation rate") for each Medicaid beneficiary the MCO covers, and the MCO provides care to the beneficiary. 2002 Final Rule, 67 Fed. Reg. at 40,989. States may receive reimbursement from the federal government for some percentage of the capitation rate so long as the underlying MCO contract is "actuarially sound." *See* 42 U.S.C. § 1396b(m)(2)(A)(iii).

As states began moving away from the fee-for-service model, HHS recognized that its definition of "actuarial soundness"—based on the cost of services under a fee-for-service model—was untenable. *See* 2002 Final Rule, 67 Fed. Reg. at 41,000 (stating that "there [was] an increasing number of States that lack[ed] recent [fee-for-service] data to use for rate setting"). It thus promulgated a final rule redefining "actuarial soundness" in 2002. *Id.* at 41,079–80 (redefining "actuarial soundness"). Under this new rule, capitation rates must satisfy three requirements to be actuarially sound. First, the rates must "[h]ave been developed in accordance with generally accepted actuarial

---

[2] Medicaid beneficiaries are those "individuals eligible for and receiving Medicaid benefits." 2002 Final Rule, 67 Fed. Reg. at 40,989.

principles and practices," 42 C.F.R. § 438.6(c)(1)(i)(A) (2002),[3] which, as explained by the actuarial office within HHS that reviews state-MCO contracts, requires accounting for all reasonable, appropriate, and attainable costs. Second, the rates must be "appropriate for the populations to be covered, and the services to be furnished under the contract." *Id.* § 438.6(c)(1)(i)(B). Third, the rates must satisfy the Certification Rule;[4] that is, they must "[h]ave been certified, as meeting the requirements of this [provision], by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board [(the "Board")]." *Id.* § 438.6(c)(1)(i)(C).

In 2010, Congress enacted the ACA, comprised by the Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act of 2010 ("HCERA"), Pub. L. No. 111-152, 124 Stat. 1029 (2010). The ACA made two changes to the regulatory scheme requiring states that requested Medicaid reimbursements for their MCO contracts to provide actuarially sound capitation rates. First, Congress imposed a new cost on certain MCOs: a federal health-insurance

---

[3] In 2016, HHS recodified the actuarial soundness requirements and the Certification Rule in 42 C.F.R. §§ 438.2, 438.4(a). Because the States challenge the 2002 version of the Certification Rule, which was in effect in 2015, and because the definitions relevant to the States' claims are unchanged, we follow the district court and the parties in discussing this version of the regulation.

[4] The Certification Rule at issue here is solely 42 C.F.R. § 438.6(c)(1)(i)(C), the certification component of the actuarial soundness definition. The States' operative complaint and motion for summary judgment objected to only that subsection. They made no mention of the other requirements. Moreover, in a motion for leave to file a second amended complaint, the States specified that the Certification Rule defined actuarial soundness as meeting the actuarial standards set by a private association of actuaries.

We clarify this point because the district court incorrectly determined that the Certification Rule at issue encompassed all three requirements. *See Texas v. United States* (*Texas I*), 300 F. Supp. 3d 810, 822 (N.D. Tex. 2018). On appeal, the States also seem to have confused which HHS regulation they were contesting, first referring to only subsection (c)(1)(i)(C) but later lumping in subsection (A) as well.

provider tax (the "Provider Fee"). *See* PPACA § 9010, 124 Stat. at 865, *amended by* PPACA § 10905, 124 Stat. at 1017, *amended by* HCERA § 1406, 124 Stat. at 1066.[5]  This Provider Fee must be paid annually by covered entities—"any entity which provides health insurance for any United States health risk," excluding governmental entities.[6]  *Id.* § 9010(c)(1), (c)(2)(B), 124 Stat. at 866.  Second, Congress amended the Medicaid Act to expressly require that capitation rates included in state-MCO contracts be actuarially sound. *Id.* § 2501(c)(1)(C), 124 Stat. at 308; 42 U.S.C. § 1396b(m)(2)(A)(xiii) ("[C]apitation rates . . . shall be based on actual cost experience related to rebates and subject to the Federal regulations requiring actuarially sound rates[.]").  What remained unchanged was that actuarially sound capitation rates required accounting for all reasonable, appropriate, and attainable costs.  Thus, when the Internal Revenue Service (the "IRS") began collecting the Provider Fee from covered entities in 2014, *see* PPACA § 9010(a), 124 Stat. at 865, states with MCO contracts were required to account for the Provider Fee to meet the actuarial soundness requirement of the Medicaid Act, *see* 42 U.S.C. § 1396b(m)(2)(A)(iii).

In 2015, the Board, an independent organization that sets appropriate standards for actuarial practices in the United States, published *Actuarial Standard of Practice 49: Medicaid Managed Care Capitation Rate Development and Certification* ("ASOP 49").  ACTUARIAL STANDARDS BD., ACTUARIAL STANDARD OF PRACTICE NO. 49: MEDICAID MANAGED CARE CAPITATION RATE DEVELOPMENT AND CERTIFICATION (2015) [hereinafter ASOP 49].  ASOP 49

---

[5] Section 9010 has not been codified in the United States Code and thus does not exist in one consolidated location.

[6] There is an exclusion for governmental entities, "except to the extent such an entity provides health insurance coverage through the community health insurance option under section 1323."  PPACA § 9010(c)(2)(B), 124 Stat. at 866.  However, this exception is not relevant here.

provides "guidance for actuaries preparing, reviewing, or giving advice on capitation rates for Medicaid programs, including those certified in accordance with 42 CFR 438.6(c)." *Id.* at iv. Medicaid capitation rates are actuarially sound if they "provide for all reasonable, appropriate, and attainable costs," which "include . . . government-mandated assessments, fees, and taxes." *Id.* at 2.

In summary, for states to receive federal reimbursement under the managed-care model, their MCO contracts must be approved by HHS as actuarially sound. *See* 42 U.S.C. § 1396b(m)(2)(A)(iii); 42 C.F.R. § 438.6(c)(1)(i). To be actuarially sound, the capitation rate must account for all costs MCOs bear when providing care to Medicaid beneficiaries. *See* 2002 Final Rule, 67 Fed. Reg. at 41,000. When Congress enacted the ACA in 2010, the amount of money states paid MCOs as part of their capitation rate changed: In contracts with MCOs subject to the Provider Fee, states must account for the Provider Fee in their capitation rate to satisfy HHS's actuarial-soundness requirement. ASOP 49 states that the "costs" include government-mandated taxes. ASOP 49 at 2.

### B.    Procedural Background

The States sued the United States, claiming that the Certification Rule and Section 9010 were unconstitutional and/or unlawful. *See Texas v. United States* (*Texas I*), 300 F. Supp. 3d 810, 820 (N.D. Tex. 2018). Regarding the Certification Rule, they claimed that the rule violated the nondelegation doctrine from Article I, section 1, of the U.S. Constitution and that HHS violated the APA on multiple grounds. *See id.* at 826. Regarding Section 9010, they claimed that the statute violated the Spending Clause of the U.S. Constitution and the doctrine of intergovernmental tax immunity under the Tenth Amendment. *See id.* at 826, 854.

No. 18-10545

Both parties moved for summary judgment. *See id.* at 826. The United States argued that the States lacked Article III standing for their claims, the States' APA claims were time-barred, and the States' arguments failed on the merits. *See id.* The district court granted both parties' motions in part. *Id.* at 821. It held that the States had standing and that their APA claims were not barred by the six-year statute of limitations. *Id.* at 834, 840. On the merits of the States' Certification Rule claims, the district court held that the rule violated the nondelegation doctrine but otherwise complied with the APA. *Id.* at 848, 850–851. On the merits of the States' Section 9010 claims, the district court held that Congress did not violate the Spending Clause or the Tenth Amendment. *Id.* at 854, 856.

The district court thus set aside the Certification Rule. *Id.* at 856–57. It then granted the States equitable disgorgement of their Provider Fee payments under the APA, resulting in a final judgment against the United States for more than $479 million. *See Texas v. United States*, 336 F. Supp. 3d 664, 675 (N.D. Tex. 2018). Both parties timely appealed.

## II.    Standard of Review

We review a district court's grant of summary judgment de novo. *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Id.* (citation omitted). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## III.    Discussion

The parties contest the constitutionality and lawfulness of the Certification Rule and the constitutionality of Section 9010. We hold that both the Certification Rule and Section 9010 are constitutional and lawful; as a

No. 18-10545

result, there can be no equitable disgorgement, regardless of whether such a remedy would be otherwise appropriate. We address each issue in turn.

## A.   The Certification Rule Claims

The States' challenge to the Certification Rule is based upon a sequence of events they allege is impermissible. Through the Certification Rule, HHS gave authority to the Board to promulgate binding rules through Actuarial Standards of Practice ("ASOPs"). Before it published ASOP 49 in 2015, the Board provided only a nonbinding "practice note" that permitted, but did not require, actuaries to consider fourteen separate factors in assessing expected MCO revenues and expenses under contracts with state Medicaid agencies, including any "state-mandated assessment and taxes." MEDICAID RATE CERTIFICATION WORK GROUP, ACTUARIAL STANDARDS BD., ACTUARIAL CERTIFICATION OF RATES FOR MEDICAID MANAGED CARE PROGRAMS 8–9 (2005). According to the States, ASOP 49 introduced the requirement that actuarially sound capitation rates account for government-mandated taxes.[7] The States thus contend that the Certification Rule unlawfully delegates to the Board the task of formulating, and making binding decisions about the applicability of, rules governing States' access to Medicaid funds. The States further argue that HHS's incorporation of ASOP 49 in the Certification Rule violated the APA in two respects: (1) the rule exceeded HHS's statutory authority, and (2) HHS adopted the rule without notice and comment.

The United States contends that we lack jurisdiction because the States lack standing to challenge the Certification Rule and because their APA claims were barred by the statute's six-year statute of limitations. On the merits, the United States argues that the States' Certification Rule challenges are

---

[7] This is an incorrect statement of the facts. HHS's Office of the Actuary stated that actuarially sound capitation rates have consistently required that all reasonable appropriate, and attainable costs be covered by rates which includes all taxes, fees, and assessments.

8

premised on a misunderstanding of Section 9010 and the Certification Rule. It claims that the Board did not change the definition of actuarial soundness, but instead HHS permissibly chose to incorporate the Board's guidance on the subject.

Thus, at issue here are two jurisdictional questions: whether the States have standing and, if so, whether their APA claims are time-barred. If we have jurisdiction, we must next address the parties' merits claims: whether the Certification Rule violates the nondelegation doctrine, and whether HHS violated the APA. We hold that the States have standing for their Certification Rule claims but that their APA claims are time-barred which, in this context, is a jurisdictional issue. We therefore address the merits of only the States' nondelegation argument and hold that the Certification Rule is constitutional.

*1.    Standing*

To satisfy Article III's standing requirement, plaintiffs must demonstrate (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561 (citations omitted). At the summary judgment stage, plaintiffs "must set forth by affidavit or other evidence specific facts, which . . . will be taken to be true," to support each element. *Id.* (internal quotation marks and citation omitted). If one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (citations omitted). We review standing issues de novo. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013) (citation omitted).

Accepting their factual allegations, summarized above, as true, we hold that the States satisfy the three requirements for standing. First, the States

No. 18-10545

alleged a particular injury in fact: having to pay millions of dollars in Provider Fees despite the ACA's explicit exemption for governmental entities. Second, the States' injury is arguably traceable to the Certification Rule. They contend that before the Board published ASOP 49, which is applied to the States via the Certification Rule, actuaries were advised that their capitation rate analysis must comport with state and federal law and that before Congress enacted the ACA, federal taxes were minor and not separately considered. ASOP 49, the States say, required them to pay the Provider Fee as part of their actuarially sound capitation rates. Though the facts underlying this argument of how the capitation rates worked under the Certification Rule before and after ASOP 49 are contested, we assume the States' view of the facts to be true for purposes of standing. *See Lujan*, 504 U.S. at 561. The attacks on ASOP 49, which have been applied to the States through the Certification Rule, are the core of this argument. Third, the States have alleged that their injury is likely to be redressed by invalidating the Certification Rule. They allege that before ASOP 49's adoption and application to the States via the Certification Rule, states still had the legal option to exclude the Provider Fee from capitation rates in their contracts with MCOs. Thus, they argue that in the rule's absence, states could not lose Medicaid funding for refusing to pay the Provider Fee "by virtue of that rule." *See Larson v. Valente*, 456 U.S. 228, 242 (1982) (holding that setting aside an allegedly unlawful statutory provision that compels plaintiffs to register and report redresses the plaintiffs' alleged injury of registering and reporting because, even though the plaintiffs could be compelled to register and report through another statutory provision, they will no longer be compelled to do so under the statutory provision at issue). Were we to rule in their favor, the Certification Rule would be invalidated and ASOP 49's explicit requirement to pay the Provider Fee would be removed.

10

No. 18-10545

The United States counters that the States' injury would not be redressed by invalidating the Certification Rule because States are required to account for the Provider Fee under 42 U.S.C. § 1396b(m)(2)(A)(iii). Indeed, as the United States notes, the States were still required to account for the Provider Fee under § 1396b after the district court invalidated the Certification Rule. Notably, the States don't challenge § 1396b here.[8]

However true the United States's argument may be, the invalidation of the Certification Rule (and thereby, the removal of requiring compliance with ASOP 49) nonetheless would remove one explicit requirement to pay the Provider Fee. To be sure, the States may still be required to pay the Provider Fee under § 1396b, but this statutory injury is not complained of here. *Barrett Comput. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989) ('[S]tanding concerns the right of a party to bring a *particular* suit." (emphasis added)). Here, the States allege they were directly forced to pay the Provider Fee per ASOP 49 and the Certification Rule. *Larson*, 456 U.S. at 242–43 (finding standing when appellants contested a "rule [that] was the sole basis for" the "discrete injury" that "gave rise to the present suit"). As such, the States attack an injury caused by the Certification Rule. Therefore, though the States may still have to pay the Provider Fee under § 1396b, success here will nonetheless remove one of two legal barriers to defeating this obligation—in other words, the States will no longer "be required to [pay the Provider Fee] by virtue of [ASOP 49 and the Certification Rule]." *Id.* at 242. Taking the States' factual allegations to be true, *see Lujan*, 504 U.S. at 561, we conclude that the States have alleged that the injury complained of in this case is redressable with a

---

[8] The States have filed a second lawsuit, this time claiming that § 1396b(m)(2)(A)(iii) is being improperly interpreted and seeking to enjoin the IRS from collecting the Provider Fee from them. Complaint at 15, *Texas v. United States* (*Texas II*), No. 4:18-CV-00779 (N.D. Tex. Sept. 20, 2018), ECF No. 1.

favorable decision. In sum, we hold that the States have standing to raise their Certification Rule claims. (Again, focusing solely on whether, assuming the facts in the States' favor, there is a traceable, redressable injury in fact.)

2.    *Statute of Limitations*

However, we lack jurisdiction to address the States' APA claims because they are time-barred. APA challenges are governed by 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The United States enjoys sovereign immunity unless it consents to suit, "and the terms of its consent circumscribe our jurisdiction." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997) (citation omitted). "The applicable statute of limitations is one such term of consent," so, unlike the ordinary world of statutes of limitations, here the failure to sue the United States within the limitations period deprives us of jurisdiction. *Id.*

HHS published the Certification Rule in 2002, thirteen years before the States filed their complaint. *See* 2002 Final Rule, 67 Fed. Reg. at 40,989. However, a plaintiff may "challenge . . . a regulation after the limitations period has expired" if the claim is that the "agency exceeded its constitutional or statutory authority. To sustain such a challenge, the claimant must show some direct, final agency action involving the particular plaintiff within six years of filing suit." *Dunn-McCampbell*, 112 F.3d at 1287. An agency's action is direct and final when two criteria are satisfied. "First, the action must mark the 'consummation' of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (quotation omitted). These rights,

obligations, or legal consequences must be new. *Nat'l Pork Producers Council v. U.S. E.P.A.*, 635 F.3d 738, 756 (5th Cir. 2011).

The district court concluded that HHS took three "direct, final agency actions" in 2015 against the States and that those actions triggered a new six-year statute of limitations period. *Texas I*, 300 F. Supp. 3d at 839 (citation omitted). But, as the United States argues, none of these actions were direct and final.

First, the district court pointed to a 2015 letter sent by HHS to the Texas Medicaid Director approving Texas's amended MCO contract, which included Provider Fees in the capitation rates for additional groups of Medicaid beneficiaries. *Id.* This letter does not show that HHS was issuing a new ruling requiring Texas to include Provider Fees in its capitation rates. Further, Texas paid costs associated with Provider Fees for the 2013 calendar year even though the 2015 letter applied only from May 1, 2015 to August 31, 2015. Thus, even before the letter, Texas accounted for the Provider Fee in its capitation rates. The letter did not mark a change to Texas's obligation under the Certification Rule.

Second, the district court stated that the government's collection of the Provider Fee through the States' 2015 capitation rate constituted direct, final agency action. *Id.* But, as explained above, the IRS does not collect the Provider Fee directly from states. The government's decision to collect from MCOs is not a "direct . . . action involving the [States]." *See Dunn-McCampbell*, 112 F.3d at 1287. As such, this argument does not support the district court's conclusion.

Third, the district court stated that HHS's 2015 guidance document "for use in setting [capitation] rates . . . for any managed care program subject to the actuarial soundness requirements" obligated the States to include the cost of the Provider Fee in their capitation rate calculations in 2015. *Texas I*, 300

F. Supp. 3d at 839–40 (citation omitted).  Once again, the guidance document did not create any new obligations or consequences; it restated that for capitation rates to be actuarially sound, they had to be consistent with ASOPs, including ASOP 49.  But this requirement has existed since HHS promulgated the Certification Rule.  *See* 2002 Final Rule, 67 Fed. Reg. at 41,097 (requiring that capitation rates be "certified . . . by actuaries who . . . follow the practice standards established by the Actuarial Standards Board").  The publication of ASOP 49 in 2015 did not create any new obligation or legal consequence either.  Actuarially sound capitation rates have consistently required that all reasonable, appropriate, and attainable costs be covered by rates; this includes all taxes, fees, and assessments.

We conclude that HHS took no direct, final agency action in 2015 to create a new obligation.  The States identified no other such action that occurred after 2009 (when the six-year statute of limitations expired).  We thus reverse the district court's judgment on the States' APA claims and dismiss those claims as time barred.

### 3.    *Nondelegation Doctrine*

Because we lack jurisdiction over the States' APA claims, the only claim we address on the merits is whether HHS unlawfully delegated authority to the Board when it promulgated the Certification Rule.  The United States argues that the Certification Rule was not an unlawful delegation because HHS simply "prescribed the conditions" necessary to receive federal funds.  *See Currin v. Wallace*, 306 U.S. 1, 16 (1939) (brackets omitted).  The States disagree, arguing that the Certification Rule impermissibly gave the Board and its actuaries—private actors—a discretionary veto over HHS's approval of States' Medicaid contracts, as well as the power to define the content of a federal law as it applies to someone else.  The district court held that the Certification Rule unlawfully vested in the Board and its actuaries the

legislative power to set rules on actuarial soundness and to veto executive action that does not comply with such rules. *Texas I*, 300 F. Supp. 3d at 843–48. We hold that it did not.

A federal agency may not "abdicate its statutory duties" by delegating them to a private entity. *See Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974). But an agency does not improperly subdelegate its authority when it "reasonabl[y] condition[s]" federal approval on an outside party's determination of some issue; such conditions only amount to legitimate requests for input. *See, e.g., U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566–67 (D.C. Cir. 2004). Therefore, the primary inquiry here is whether HHS's requirements—that state-MCO contracts be certified by a qualified actuary and that the Board's practice standards be followed—were reasonable conditions for approving the contracts. *See id.* at 567.

A condition is reasonable if there is "a reasonable connection between the outside entity's decision and the federal agency's determination." *Id.* By way of example, the Third Circuit has upheld a U.S. Department of Homeland Security's ("DHS's") regulation requiring H-2B visa employers to first obtain a temporary labor certification from the U.S. Department of Labor ("DOL"). *La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 672–73 (3d Cir. 2014). In so doing, the Third Circuit observed that there was a reasonable connection in DHS conditioning an H-2B visa on a certification from DOL: Congress charged DHS with admitting aliens into the United States to perform temporary work that cannot be performed by unemployed persons in this country, *id.* at 672 (citing 8 U.S.C. §§ 1101(a)(15)(H)(ii)(b), 1184(c)(1)), and

No. 18-10545

DOL could help in that analysis by bringing to bear its "institutional expertise in labor and employment matters," *La Forestry Ass'n*, 745 F.3d at 673.[9]

The Certification Rule's conditions for actuarial soundness, like the DHS conditions addressed by the Third Circuit,[10] are reasonable. Congress requires capitation rates to be actuarially sound, as defined by HHS. *See* 42 U.S.C. § 1396b(m)(2)(A)(xiii). HHS imposed the Certification Rule as a condition for actuarial soundness. 42 C.F.R. § 438.6(c)(1)(i)(C). Certification by a qualified actuary who applies the Board's standards is reasonably connected to ensuring actuarially sound rates because the Board and a qualified actuary have institutional expertise in actuarial principles and practices. Indeed, HHS simply incorporated the Board's actuarial standards into its Certification Rule, a common and accepted practice by federal agencies. *See Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018) (noting that federal agencies have incorporated by reference over 1,200 standards established by private organizations);[11] *Amerada Hess Pipeline Corp. v. F.E.R.C.*, 117 F.3d 596, 601 (D.C. Cir. 1997) (holding that a federal

---

[9] The Tenth Circuit, in an unpublished opinion, held opposite to the Third Circuit and concluded that DHS subdelegated authority to DOL. *G.H. Daniels III & Assocs., Inc. v. Perez*, 626 F. App'x 205, 211 (10th Cir. 2015). It determined that DOL's certification was not a condition for granting agency approval because DOL has the final say when it denies a certification. *Id.* But that is the nature of conditions: any condition, if not satisfied, prevents federal approval. By the Tenth Circuit's logic, it seems that *every* third-party condition for granting federal agency approval is a subdelegation. That result is impossible to square with the very existence of a condition analysis. *See U.S. Telecom*, 359 F.3d at 565–68. The Third Circuit's reasoning is therefore more persuasive.

[10] Although the Certification Rule differs from the DHS condition in *Louisiana Forestry* insofar as the Certification Rule incorporates the standards of and requires approval by private entities, this private/public distinction is not relevant to our analysis. *See U.S. Telecom*, 359 F.3d at 566 (rejecting the argument that the "limitations on an administrative agency's power to subdelegate might be less stringent if the delegee is a sovereign entity rather than a private group"). *Louisiana Forestry* therefore remains on-point and instructive.

[11] Therefore, accepting the States' argument would jeopardize over a thousand regulations promulgated by federal agencies.

agency did not abdicate its authority by adopting generally accepted accounting principles, noting that it would be anomalous to accord agency deference when an agency invented standards but not when an agency's expertise led the agency to incorporate standards endorsed by experts in the field). Thus, as the United States remarked, "HHS could achieve *exactly the same result* by promulgating regulations that adopted the substance of the . . . Board's standards." Accordingly, we hold that the Certification Rule's actuarial certification requirement and incorporation of the Board's practice standards are reasonable conditions, not subdelegations of authority.

But, even assuming arguendo that HHS subdelegated authority to private entities, such subdelegations were not unlawful. Agencies may subdelegate to private entities so long as the entities "function subordinately to" the federal agency and the federal agency "has authority and surveillance over [their] activities." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940);[12] *cf. Lynn*, 502 F.2d at 59 (holding that total delegation or "rubber stamping" is impermissible). An agency retains final reviewing authority if it "independently perform[s] its reviewing, analytical and judgmental functions." *Lynn*, 502 F.2d at 59. We have therefore held, for instance, that a federal agency's requirement that depreciation expenses reflect "state regulator approved depreciation rates" was not an unlawful subdelegation because the agency "exercised its role when it initially reviewed and accepted the . . .

---

[12] *See also R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952) (holding that an agency did not unconstitutionally subdelegate powers to a private entity because the agency retained power to approve or disapprove rules and to review disciplinary actions); *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 19 (D.D.C. 1999) ("Delegations by federal agencies to private parties are, however, valid so long as the federal agency or official retains final reviewing authority." (citations omitted)).

incorporati[on] [of] the state agencies' depreciation rates."[13]  *La. Pub. Serv. Comm'n v. F.E.R.C.*, 761 F.3d 540, 551–52 (5th Cir. 2014).  The D.C. Circuit has even come to similar results with respect to approvals hinging on the work of private actuarial entities like those at issue in this case.  *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 708 & n.5 (D.C. Cir. 1977) (holding that an agency may subdelegate certain components of actuary certification for administering federal pension plans to a private agency because the certification process was "superintended by the [agency] in every respect," insofar as the agency ultimately certified each actuary).[14]

Here, HHS's subdelegation of certain actuarial soundness requirements to the Board did not divest HHS of its final reviewing authority.  HHS "reviewed and accepted" the Board's standards.  *See La. Pub. Serv. Comm'n*, 761 F.3d at 552; *accord* 2002 Final Rule, 67 Fed. Reg. at 40,998.  Further, HHS has the ultimate authority to approve a state's contract with MCOs; certification is a small part of the approval process.  To obtain HHS approval of its capitation rate for reimbursement purposes, a state sends its MCO

---

[13] We also noted that the federal agency would "continue to exercise oversight of the state rates in a Section 206 complaint proceeding," which provides that any entity that wants to change the depreciation rates may seek modification with the agency through a Section 206 filing.  *La. Pub. Serv. Comm'n*, 761 F.3d at 552.  States retain a similar recourse here: any state dissatisfied with the Board's practice standards can petition HHS for "amendment[] or repeal" of the Certification Rule's requirement that the Board's practice standards be followed.  *See* 5 U.S.C. § 553(e).

[14] Applying similar reasoning, the D.C. Circuit also upheld an agency regulation that permitted nonprofit organizations to stage political candidacy debates so long as they "use[d] pre-established objective criteria to determine which candidates may participate in a debate."  *Perot v. FEC*, 97 F.3d 553, 556, 559–60 (D.C. Cir. 1996) (per curiam) (quoting 11 C.F.R. § 110.13).  Although the agency gave private entities "the latitude to choose their own 'objective criteria,'" such private entities acted at their peril if they did not first secure an agency advisory opinion that their criteria were satisfactory.  *Perot*, 97 F.3d at 560.  The court thus determined that "[t]he authority to determine what the term 'objective criteria' means rest[ed] with the agency" and held that the agency did not unconstitutionally subdelegate legislative authority.  *Id.*

contract to the appropriate HHS Regional Office. If the state provides all required documentation, the Office of the Actuary ("OACT"), an office within HHS, will begin its actuarial review. OACT reviews the contract by looking at all of the assumptions, data, and methodology in the rate certification to ensure the certification is consistent with actuarial principles and methods. If OACT determines that the capitation rates are actuarially sound, it will write a memo confirming this conclusion and send the contract to HHS's Center for Medicaid and CHIP (Children's Health Insurance Program) Services[15] for final review. The Center will then review the rate certification and OACT's memo and approve the contract if it finds no issues. The contract approval process is closely "superintended by [HHS] in every respect." *See Tabor*, 566 F.2d at 708 n.5. Therefore, even assuming arguendo that HHS subdelegated certain actuarial soundness requirements to third parties, we hold that HHS's subdelegations were lawful.

**B.     Section 9010 Claims**[16]

The States raise two constitutional challenges against Section 9010. They claim that it violates the Spending Clause and the Tenth Amendment doctrine of intergovernmental tax immunity. We address each claim in turn and hold that Section 9010 does not violate either constitutional provision.

---

[15] The Center for Medicaid and CHIP Services is the component of HHS that is "responsible for the various components of policy development and operations for Medicaid, [CHIP], and the Basic Health Program . . . ." *See Organization*, CTRS. FOR MEDICARE & MEDICAID SERVS., http://www.medicaid.gov/about-us/organization/index.html (last visited July 17, 2020). In that regard, the Center oversees state-MCO contract approvals.

[16] While the United States does not contest standing on this, we note that the States have standing for their Provider Fee claims. *See Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) (per curiam) (citation omitted) (holding that courts must examine standing sua sponte if it has erroneously been assumed below). The States allege that they were injured when they were forced to pay the Provider Fee. This injury is traceable to the United States's allegedly unlawful conduct of enforcing Section 9010 after Congress imposed the Provider Fee as part of the ACA. *See* PPACA § 9010(a), 124 Stat. at 865. Invalidating the Provider Fee would thus redress the States' claimed injury.

No. 18-10545

1.     *Spending Clause*

The parties contest whether the Spending Clause applies to Section 9010 at all.  The United States argues that Section 9010 is instead a constitutional tax that Congress imposed under its taxing power, which fully resolves the Spending Clause claim.  The States argue that the Provider Fee, as applied to them, functions as a condition on spending and thus implicates the Spending Clause.  We hold that the Provider Fee is a constitutional tax that fully resolves the States' Spending Clause claim and does not impose a condition on spending.

For a payment requirement to qualify as a tax, it must "produce[] at least some revenue for the Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 564 (2012).  In addition, the Supreme Court has identified three factors to be considered in determining whether a payment requirement is a tax rather than a penalty: (1) whether the tax is enforced by the IRS; (2) whether the tax "impose[s] an exceedingly heavy burden"; and (3) whether the tax has a scienter requirement, which is typical of a penalty. *Id.* at 565–66.  The Provider Fee produces revenue for the United States and satisfies at least two of the three factors.[17]  The Provider Fee is enforced by the IRS, *see* 26 C.F.R. § 57.8, and applies to any covered entity regardless of scienter, PPACA § 9010(a), 124 Stat. at 865.  Indeed, several Supreme Court justices have noted that the Provider Fee is a tax. *See NFIB*, 567 U.S. at 694, 698 (Scalia, Kennedy, Thomas & Alito, JJ., dissenting) (identifying Section 9010 as an "excise tax").  So have the parties.

---

[17] The record does not indicate what percentage of a covered entity's net revenue is allocated to paying the Provider Fee.  Thus, we cannot evaluate whether the Provider Fee "impose[s] an exceedingly heavy burden," *see NFIB*, 567 U.S. at 565, but the absence of such evidence does not support the States' argument.

No. 18-10545

Section 9010's constitutionality as a legitimate tax fully resolves the States' Spending Clause claim. *See id.* at 561, 563 (holding that even though the ACA's individual mandate was unconstitutional under the Commerce Clause, it would uphold the mandate if it were constitutional under the taxing clause). Although the States argue that Section 9010 imposes a condition on their Medicaid funding, we conclude that it does not. *See* PPACA § 9010(a), 124 Stat. at 865. The specific Medicaid funding condition that the States contest is in the Medicaid Act. 42 U.S.C. § 1396b(m)(2)(A)(iii) (requiring that for states to receive Medicaid reimbursement, their expenditures "for payment . . . under a prepaid capitation basis . . . for services provided by any entity . . . [must be] made on an actuarially sound basis"). The States do not contest the constitutionality of this section,[18] and they thus do not have a Spending Clause claim. In sum, we hold that the Provider Fee is a constitutional tax that does not violate the Spending Clause.

### 2.    *Tenth Amendment—Intergovernmental Tax Immunity*

Although a constitutional tax properly enacted through Congress's taxing power is generally not subject to other constitutional provisions, the Tenth Amendment doctrine of intergovernmental tax immunity imposes two limitations when the federal government imposes an indirect tax, like Section 9010, on states. *See South Carolina v. Baker*, 485 U.S. 505, 523 (1988).[19] First, the tax must not discriminate against states or those with whom they deal. *Id.*

---

[18] Indeed, they conceded as much at oral argument.

[19] A tax is imposed directly on states only "when the levy falls on the [states themselves], or on an agency or instrumentality so closely connected to" the states that the agency or instrumentality cannot be viewed as separate from the states. *Baker*, 485 U.S. at 523 (internal quotation marks and citation omitted). MCOs are not so closely connected to the states that they cannot be viewed as separate from them. *See* PPACA § 9010(c)(1), 124 Stat. at 866 (defining a "covered entity" as "any entity which provides health insurance for any United States health risk").

Second, the "legal incidence" of the tax may not fall on states. *United States v. Fresno Cty.*, 429 U.S. 452, 459 (1977). We hold that Section 9010 satisfies both requirements.

### a.     Discrimination Against Entities

The Provider Fee is nondiscriminatory because it is imposed on "any entity which provides health insurance," subject to certain non-state-based exclusions. PPACA § 9010(c), 124 Stat. at 866. It does not impose the Provider Fee on only states, nor on only those MCOs that deal with states. Thus, there is no unlawful discrimination, meaning MCOs contracting with states may impose "part or all of the financial burden" of the Provider Fee on the States. *See Baker*, 485 U.S. at 521 (citations omitted).

The States make two arguments on this point, both of which are misplaced. First, the States argue that the Provider Fee discriminates against them because states are the only entities that run Medicaid programs and are the only government entities that stand to lose their exemption under Section 9010(c)(2)(B) as a result of the actuarial-soundness requirement. But the discrimination inquiry asks who Congress targets, not who ultimately bears the economic burden of paying the tax. *See id.* (stating that the Supreme Court has "completely foreclosed any claim that the nondiscriminatory imposition of costs on private entities that pass them on to States . . . unconstitutionally burdens state . . . functions"); *Washington v. United States*, 460 U.S. 536, 543–44 (1983) (holding that the discrimination analysis does not consider whether the tax burden would necessarily shift to state actors).

Second, the States argue that the Provider Fee discriminates against them because the fee has a disproportionate economic impact on them. They claim that because their contracts with MCOs have historically low profit margins, the MCOs pass the entire economic burden of the Provider Fee on to

the states.  They thus argue that states shoulder a harsher economic burden than other MCOs, which could afford to pay a portion of the Provider Fee.

*Washington*, which the States cite as support, holds that whether an unfair economic burden is discriminatory depends on "the whole tax structure of the state."  460 U.S. at 545 (citation omitted).  In that case, the Supreme Court held that the state's tax did not single out contractors who worked for the United States for discriminatory treatment because the "tax on federal contractors [was] part of the same [tax] structure, and imposed at the same rate, as the tax on the transactions of private landowners and contractors."  *Id.* Here, the Provider Fee is similarly imposed at the same rate for all entities, so there is no unfair economic burden.  *See* PPACA § 9010(b)(1), 124 Stat. at 865. We thus hold that the Provider Fee is nondiscriminatory.

> b.    Legal Incidence

We also hold that the legal incidence of the Provider Fee does not fall on states.  Legal incidence is determined by the "clear wording of the statute," not "by who is responsible for payment to the state of the exaction."  *United States v. State Tax Comm'n of Miss.*, 421 U.S. 599, 607–08 (1975) (cleaned up).  For example, a state tax statute that directs each vendor in the state to "add to the sales price and [to] collect from the purchaser the full amount of the tax imposed" is a statute that "imposes the legal incidence of the tax upon the purchaser" because the text of the statute indisputably provides that the tax "must be passed on to the purchaser."  *First Agric. Nat'l Bank of Berkshire Cty. v. State Tax Comm'n*, 392 U.S. 339, 347 (1968) (citations omitted).

Here, as the States concede, Congress did not intend to tax States because the statute's "clear wording" shows that Congress clearly and expressly excluded states from the Provider Fee.  *See* PPACA § 9010(c)(2)(B), 124 Stat. at 866; *accord State Tax Comm'n of Miss.*, 421 U.S. at 607.  It is also clear and "indisputable" that Section 9010 "by its terms" does not pass on the

No. 18-10545

Provider Fee to states. *See First Agric. Nat'l Bank*, 392 U.S. at 347. Thus, the legal incidence of the Provider Fee does not fall on states.

The States misunderstand the meaning of legal incidence. They argue that the legal incidence falls on them because all of the economic burden of the Provider Fee is charged to the States. But, as stated above, the question is not who practically bears the responsibility for paying the tax. *See State Tax Comm'n of Miss.*, 421 U.S. at 607–08; *see also Baker*, 485 U.S. at 521 (citations omitted) (upholding a nondiscriminatory tax collected from private parties as constitutional "even though . . . all of the financial burden f[ell] on the other government"). The States also argue that because the legal consequence of not paying the Provider Fee falls on them, so too does its legal incidence; if they do not pay the Provider Fee, then they lose Medicaid funding. Assuming arguendo that the States' interpretation of healthcare law is correct, the Supreme Court explicitly held that legal incidence is not defined as "the legally enforceable, unavoidable liability for nonpayment of [a] tax." *State Tax Comm'n of Miss.*, 421 U.S. at 607 (citation omitted).

In sum, we conclude that the Provider Fee does not discriminate against states or those with whom they deal because it is imposed on any entity that provides health insurance (with certain exclusions). We also conclude that the legal incidence of the Provider Fee does not fall on the states because Congress expressly excluded states from paying the fee. Accordingly, we hold that Section 9010 does not violate the Tenth Amendment doctrine of intergovernmental tax immunity.

## IV.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling that the States had standing. But we REVERSE the district court's ruling that the States' APA claims were not time-barred and DISMISS the States' APA claims for lack of jurisdiction. On the merits, we AFFIRM the district court's

24

No. 18-10545

judgment that Section 9010 does not violate the Spending Clause or the Tenth Amendment, but we REVERSE the district court's judgment that the Certification Rule violates the nondelegation doctrine and RENDER judgment in favor of the United States. We thus VACATE the district court's grant of equitable disgorgement,[20] as there is nothing to remedy.

---

[20] Therefore, we do not reach the issues surrounding the validity of such a remedy in this context.